UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PRIME MOVER CAPITAL PARTNERS L.P., et al.,

               Plaintiffs,

        -against-                                  10 Civ. 2737 (LAK)

ELIXIR GAMING TECHNOLOGIES, INC., et al.,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

           Daniel A. Osborn
           OSBORN LAW, P.C.
           *Attorney for Plaintiffs*

           Paul R. Bessette
           Michael A. Piazza
           Jesse Z. Weiss
           GREENBERG TRAURIG LLP
           *Attorneys for Defendant Elixir Gaming Technologies, Inc.*
           *and the Individual Defendants*

           David J. Schindler
           Robert W. Perrin
           Matthew L. Kutcher
           Cameron Smith
           LATHAM & WATKINS LLP
           *Attorneys for Defendant Elixir Group Limited*

LEWIS A. KAPLAN, *District Judge.*

        This is an action by several U.S. hedge funds for damages under Sections 10(b) and

2

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act")[1] and Rule 10b-5 thereunder,[2][3] as well as on common law theories, for damages in connection with their purchases of shares in Elixir Gaming Technologies, Inc. ("EGT").  Plaintiffs claim that the defendants intentionally made misrepresentations that inflated EGT's share price, that the plaintiffs purchased shares of EGT at that inflated price, and that they were injured when the truth became known and the share value then declined.  The matter is before the Court on motions by the remaining defendants – EGT, Elixir Group Limited ("EGL"), and the individual director and/or officer defendants (the "Individual Defendants")[4] – to dismiss the action for failure to state a claim upon which relief may be granted. For the reasons set forth below, their motions are granted in part and denied in part.

*Facts*

The well pleaded factual allegations of the complaint are assumed to be true for purposes of the motions.[5]

---

[1]
    15 U.S.C. §§ 78j(b), 78t(a).

[2]
    17 C.F.R. § 240.10b-5.

[3]
    Plaintiffs sue also under the Nevada Securities Law.  Amended complaint ("Cpt.") ¶¶ 135-41.

[4]
    The motion of defendants Melco International Development Limited ("Melco") and Lawrence Ho to dismiss the action for lack of personal jurisdiction [DI 35] already has been granted.  *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, — F. Supp. 2d —, 2011 WL 70144 (S.D.N.Y. Jan. 4, 2011).

[5]
    *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *See also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).

    In addition to the complaint, the plaintiffs have submitted a declaration and additional

*The Parties*

    *Plaintiffs*

        Plaintiffs are hedge funds that claim to have purchased shares of EGT on the open market "[d]uring 2006 and the early part of 2007."[6]  Plaintiffs Strata Fund L.P., Strata Fund Q.P., L.P., and Strata Offshore Fund, Ltd. (collectively, "Strata") claim also that they bought securities of EGT in private placements pursuant to two separate agreements: (1) a Securities Purchase Agreement ("SPA") executed by EGT and certain purchasers, including Strata, on October 19, 2007, and (2) a Warrant Purchase Agreement ("WPA") executed by EGT, EGL, and certain purchasers, including Strata, on December 10, 2007,[7] in which the purchasers contracted both to purchase warrants from EGL and immediately to exercise those warrants by purchasing stock from EGT.[8]

---

exhibits [DI 46] in opposition to the motions.  "When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment . . . and afford all parties the opportunity to present supporting material." *Friedl v. New York*, 210 F.3d 79, 83 (2d Cir. 2000) (internal quotations omitted). Accordingly, the Court is obliged either to exclude these materials or to convert the motion into one for summary judgment.  *See Gurary v. Winehouse*, 190 F.3d 37, 42-43 (2d Cir. 1999) (upholding district court's consideration of affidavit and conversion of motion to dismiss to motion for summary judgment).  The Court excludes the additional materials except for those documents that were referenced, and relied upon, in the complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 & n.3 (2d Cir. 2002).

[6]     *Id.* ¶ 40.

[7]     Plaintiffs acknowledge that the WPA was executed on December 10, 2007, rather than December 11, 2007, as alleged in the complaint.  *See* Pl. Mem. [DI 44], at 52 n.38; Cpt. ¶ 95.

[8]     Cpt. ¶¶ 87-88, 95-99.

4

*Defendants*

EGT is a corporation organized under the laws of and having its principal place of business in Nevada.[9]  At all times relevant to this motion, its stock has traded on the American Stock Exchange.[10]  EGL is a corporation organized under the laws of and having its principal place of business in Hong Kong.[11]  Each Individual Defendant was a director and/or officer of EGT and/or EGL during the period in which plaintiffs allege EGT's price fraudulently was inflated.[12]

*EGL's Contractual Relationship With EGT*

On or about June 12, 2007, EGL entered into a Securities Purchase and Product Participation Agreement (the "SPPPA") with EGT's predecessor, VendingData Corporation.[13]  Under the terms of that agreement, VendingData (now EGT) agreed, among other things, to issue equity securities and warrants to EGL as part of an "earn-in" arrangement.  The extent of the equity interest to be acquired depended upon the number of electronic gaming machines ("EGMs") placed by EGT, pursuant to Participation Agreements secured by EGL, with gaming operators in Asia.  The

---

[9]

     *Id.* ¶¶ 2, 10.

[10]

     *Id.*

[11]

     *Id.* ¶ 12.

[12]

     *Id.* ¶¶ 14-26.

[13]

     *Id.* ¶¶ 41-51.

SPPPA states that "subject to the Placement of 1,000 EGMs on or before the Closing Date,"[14] EGT would issue to EGL 25 million shares of EGT common stock, reduce the exercise price of certain EGT stock warrants previously purchased by EGL, and amend the terms of those warrants so they would be freely transferable.[15]  EGL was to receive another 15 million shares of EGT common stock and additional reductions in warrant exercise prices once EGT had "entered into Participation Agreements for the Placement of a Cumulative Total of 2,000 EGMs" and "actual Placement of a Cumulative Total of 1,000 EGMs" had been achieved.[16]

On September 10, 2007, the SPPPA was approved by EGT's shareholders and deemed fair by an independent advisor, after which EGT's board proceeded with the initial closing.[17]

---

[14]

According to the SPPPA, "'Placement' means a Qualified Lessee's full-time operation of an EGM in its public gaming area pursuant to a Participation Agreement (subject to any temporary closure of such public gaming area for a period of up to three months as may be required in order to comply with applicable Legal Requirements or due to any public safety reasons or such other causes which are beyond the reasonable control of the relevant Qualified Lessee)."  Weiss Decl. [DI 33], Ex. 3, at 7 (a copy of the SPPPA is attached to VendingData's Form 8-K filed with the SEC on June 13, 2007).

[15]

*Id.* at 9.

[16]

*Id.*

"'Participation Agreement' means . . . a written lease agreement between [EGT] and a Qualified Lessee, pursuant to which the Company leases an EGM to the Qualified Lessee, for a minimum period of three years, and the Qualified Lessee agrees to (a) locate in the Qualified Lessee's public gaming area and make available to the gaming public the EGM, and (b) pay to [EGT] at least 20% of the Net Win for the operation of the EGM."  *Id.* at 7.

"'Cumulative Total' means (a) when used in the context of Participation Agreements for the Placement of EGMs, the total number of EGMs subject to Placement under Participation Agreements that are in full force and effect, and where the Qualified Lessee is not then in material breach thereof, and (b) when used in the context of the Placement of EGMs, the total number of EGMs subject to Placement net of any EGMs previously subject to Placement that have been removed from operation by the Qualified Lessee."  *Id.* at 3.

[17]

Cpt. ¶¶ 62, 70-72.

6

According to the amended complaint, EGL ultimately came to own 75 percent of EGT as a result of this "earn-in" arrangement.[18]

*Strata Purchases EGT Common Stock in Two Private Placements*

In the three months after the SPPPA closed, EGT made two private placements of its common stock.[19]  It sold $52.5 million worth of its common stock to Strata and others pursuant to the SPA on October 19, 2007.[20]  About two months later, on December 10, 2007, EGT, EGL, Strata, and other purchasers signed the WPA, pursuant to which (1) EGL sold to Strata and others 16 million warrants that had been repriced in September when the SPPPA closed, and (2) Strata and the other purchasers immediately exercised those warrants in full, purchasing stock from EGT.[21]

*The Allegedly False and Misleading Statements*

Plaintiffs allege that between June 13, 2007, when the SPPPA first was announced,

---

[18]
> Cpt. ¶ 42; *see also* Weiss Decl., Ex.12, at 2-3 (EGT's Form 8-K, filed with the SEC on Sept. 14, 2007, indicating that EGL met its first milestone under the SPPPA and was issued 25 million shares of EGT common stock on September 10, 2007); Cpt. ¶¶ 79-80 ("On September 13, 2007, [EGL] represented that it had met the second milestone of the [SPPPA], i.e., that [EGT] had, as of that date, entered into 'Participation Agreements' for the 'Placement' of a 'Cumulative Total' of 2,000 EGMs and the 'actual Placement of a Cumulative Total of 1,000 EGMs' had occurred.").

[19]
> Cpt. ¶ 87.

[20]
> *Id.* (Strata paid $13,300,000 for its shares pursuant to the SPA).

[21]
> *Id.* ¶¶ 95-97 (Strata purchased and committed immediately to exercise warrants for roughly 3 million shares, for a total purchase price of $11,074,050); Weiss Decl., Ex. 15 (WPA), § 2.1-2.2 (describing parties' respective obligations pursuant to the WPA to sell, purchase, and exercise warrants).

and December 10, 2007, when Strata made its final alleged purchase of EGT common stock,[22] the

defendants issued press releases, made statements in conference calls and road shows, met with EGT

shareholders, and made SEC filings in the course of which they made false and misleading

statements concerning EGT's business and future prospects.[23]   These may be grouped and

summarized as follows:

> 1.    Defendants claimed to have entered into Participation Agreements for the placement of thousands of EGMs at Asian gaming venues when the defendants knew that many of these agreements were memorialized in non-binding "memoranda of understanding" rather than "binding written lease contracts."[24]  As a result, many of the defendants' statements regarding how many EGMs had been or were going to be placed, and how many agreements for placement had been secured, allegedly were false or highly misleading.

> 2.    Defendants represented that the CasinoLink Enterprise Edition casino management system ("CasinoLink") would be installed in the EGMs that they placed in Asian gaming venues, allowing EGT to monitor those units and providing data that would improve EGT's marketing and enhance profitability.[25]

> 3.    Defendants represented that they expected the EGMs to generate an average "net win" of $125 per day per machine – averaged over a year of operations and over all of the EGMs placed in Asian venues – and that this estimate was based on the defendants' due diligence.[26]

---

[22]

> Plaintiffs in fact allege that the share price was inflated for the entire period between June 13, 2007, and August 13, 2008.  Cpt. ¶¶ 124-25.  For purposes of analyzing plaintiffs' claims, however, only those misrepresentations that predated plaintiffs' stock purchases – that is, before December 10, 2007 – are relevant.

[23]

> *Id.* ¶¶ 41, 52-55, 57-58, 60-61, 63-69, 83-85, 89-94, 101-05, 108-11, 113.

[24]

> Cpt. ¶ 3(a); *see also, e.g.*, *id.* ¶¶ 63-65; Pl. Mem. 2-7.

[25]

> Cpt. ¶ 3(c); *see also, e.g.*, *id.* ¶¶ 60, 74, 93(c); Pl. Mem. 8-10.

[26]

> Cpt. ¶ 3(d); *see also, e.g.*, *id.* ¶¶ 55, 58, 93; Pl. Mem. 11-13.

8

4.      Defendants represented that EGT would receive (and later, was receiving) a minimum of 20 percent participation share of the net win from the venues.[27]

5.      Defendants represented that EGT would install the "best possible type" of EGM for each gaming venue as determined by due diligence with respect to that venue.[28]

6.      Defendants stated that they expected earnings before interest, taxes, depreciation, and amortization ("EBITDA") to be as high as 60 to 90 percent.[29]

7.      Defendants claimed that EGT, by virtue of its relationship with EGL, "had access to significant sources of capital to fund and expand" its new business and had special connections in the Asian gaming market that would give EGT a competitive advantage.[30]

Plaintiffs claim that the defendants made these alleged misrepresentations in order to inflate EGT's stock price, secure shareholder approval of the SPPPA, and procure additional investments, including those made by Strata and others pursuant to the SPA and WPA.[31]

*Alleged Disclosures*

Plaintiffs assert that EGT's share price was inflated by these alleged misrepresentations when they bought its stock and that they were injured when public disclosure of

---

[27]

Cpt. ¶ 3(e); *see also, e.g.*, *id.* ¶¶ 53, 93(f); Pl. Mem. 11-13.

[28]

Cpt. ¶ 3(f); *see also, e.g.*, *id.* ¶ 93(c); Pl. Mem. 17-18.

[29]

Cpt. ¶ 3(h); *see also, e.g.*, *id.* ¶¶ 55, 59, 93(g); Pl. Mem. 16.

[30]

Cpt. ¶ 3(i); *see also, e.g.*, *id.* ¶¶ 58-59, 61, 66-67; Pl. Mem. 14-15.

[31]

*See* Cpt. ¶¶ 4, 95.

the truth caused the price to decline.[32]   The complaint, however, tells two different stories as to precisely when, how, and why this decline occurred.

On the one hand, the complaint repeatedly states that EGT's stock "artificially [was] inflated . . . between June 13, 2007 and August 13, 2008,"[33] when "[EGT] finally revealed its net win reports by country, which were of course far short of the $125 day figure, and admitted that CasinoLink was only present in five venues of the fifteen it had opened."[34]  It thus implies that the disclosures that caused the price drop of which they complain did not occur until August 13, 2008.

On the other hand, detailed allegations in the complaint tell another story, suggesting a series of disclosures that caused EGT's stock price to decline more gradually between February 19, 2008, and August 13, 2008.[35]  First, plaintiffs allege that there was an analyst conference call on February 19, 2008, during which EGT disclosed an important change to its Asian gaming business metric.  Whereas defendants are alleged to have represented previously that they expected the EGMs placed at Asian venues to have an average daily net win rate of $125 per machine, averaged over all venues for a year of operation, defendant Pisano allegedly announced in the February 19 conference call that EGT then expected that EGMs would not achieve that average net win rate until

---

[32]

See, e.g., id. ¶ 124 ("As a result of their purchases of [EGT's] securities between June 13, 2007 and August 13, 2008, Plaintiffs suffered economic loss, i.e., damages, under the federal securities laws, in an amount to be determined at trial, but in no event less than $25,000,000.").

[33]

Id. ¶ 125.

[34]

Id. ¶ 114.

[35]

Id. ¶ 126 ("When [EGT] finally began disclosing the true state of [its Asian gaming business], the price of [EGT's] common stock fell to less than $2.00 per share in just over a month and ultimately to less than $0.10 per share.  This drop removed the inflation from the price of [EGT's] stock . . . .").

after they had been in operation for 12 months.[36]  According to plaintiffs, "[t]his was the first time [that EGT] stated that the $125 net win per day figure assumed a twelve month prior operating history."[37]  They allege that "[i]n the days following [the February 19, 2008] conference [call, EGT's] stock price fell, presumably reflecting investors' displeasure with the report that [EGT] now expected the average $125 daily net win per machine would take a year to achieve."[38]  "By March 27, 2008 [EGT's] stock had fallen by 50% off its highest price."[39]

The complaint alleges that, in the months following that first disclosure, the

---

[36]

*Id.* ¶ 105(i) ("For our modeling, we have assumed that at the end of one year, the machines on the floor will be achieving a $125 return.").

On February 25, 2008, defendant Reberger acknowledged and explained this change, stating that

". . . . [W]ith more units being placed in operation in December, January, and February that is providing [EGT] with additional data points, we believe it's prudent to have a more conservative baseline expectation in the marketplace with a ramp-up to achieve the $125 net win per day threshold.

"We now believe that we will achieve our goal of $125 in win per day by the end of the first 12 months that the devices are in operation. . . . The reason why it will take longer to achieve the $125 per day threshold is that a longer period of time is now expected for customer patronage in the venues to reach the required level."

Weiss Decl. Ex. 21, at 3.  Pisano made similar statements on the same call: "What we've found, and this is reflected in our $125 per-day net win with the new business, these are also new operators, and they take time to learn the business. . . . This has slowed down our take-up in the first six months, and is reflected in the numbers."  *Id.* at 5.

[37]

*Id.*

[38]

*Id.* ¶ 106.

[39]

*Id.* ¶ 109.

Plaintiffs have alleged only additional misrepresentations, however, and not any additional disclosures, between February 19, 2008, and March 27, 2008.  *See id.* ¶¶ 106-109.

defendants continued to assert many of the misrepresentations previously alleged[40] but that they also made additional disclosures that caused the stock price to decline further.  The next alleged public disclosure occurred on March 31, 2008, when EGT filed its 2007 Form 10-K, which made clear for the first time that EGT's EBITDA had been negative, allegedly contrary to the defendants' previous representations.[41]

Plaintiffs claim also that defendants made certain disclosures to them in private in April and May of 2008.  In late April, Reberger allegedly told an EGT representative that EGL did not enjoy any special relationship with Filipino authorities, as previously claimed.[42]  And on May 22, 2008, Reberger allegedly admitted in a private conversation that most of the EGMs that had gone into operation had not been equipped with CasinoLink.[43]

Aside from the price decline following the February 2008 disclosure, however, plaintiffs have alleged almost no details regarding how, if at all, any particular disclosure affected EGT's stock price.  The complaint merely alleges in general terms that "[a]s 2008 progressed, further information emerged that revealed the misrepresentations described for what they were.  By

---

[40]

*See, e.g.*, *id.* ¶¶ 106-11, 113 (defendants continued to claim that "we will achieve our goal of $125 in win per day by the end of the first 12 months that the devices are in operation," that they expected to receive at least 20% of revenue on each contract, that working with EGL provided unique opportunities to penetrate Asian gaming markets, and that the business remained in good shape and EGM Placements were proceeding as planned).

[41]

*Id.* ¶ 93(g).

[42]

*Id.* ¶ 68(e).

[43]

*Id.* ¶ 112.

Plaintiffs have alleged no facts indicating that this knowledge became public, however, until EGT filed its Form 10-Q in August 2008.  *Id.* ¶¶ 113-14.

August 13, 2008, when [EGT] finally revealed its net win reports by country, which were of course far short of the $125 day figure, and admitted that CasinoLink was only present in five venues of the fifteen it had opened, its stock was down 90% for the year."[44]

Plaintiffs do not allege that the stock price declined any further after August 13, 2008, but it seems that the writing was on the wall by then.  In October 2008, EGT and EGL announced that they were discontinuing their joint Asian gaming venture as established under the SPPPA.[45]  It was not until November 8, 2008 – well after the alleged price-inflation already had been removed from EGT's stock price – that certain Individual Defendants allegedly admitted for the first time, in a conference call with Prime Mover representatives, that the prior EGT leadership had not had any special expertise with similar business models, had badly mismanaged EGT's Asian gaming business, and had done no due diligence on particular venues, and that many of the agreements between EGT and the gaming venues had taken the form of "memoranda of understanding" rather than "binding written lease agreements."[46]  Plaintiffs claim to have learned also, in "the fourth quarter of 2008," that EGL's parent company, Melco, never had had any intention of causing EGL to capitalize EGT's Asian gaming business through the exercise of warrants.[47]

---

[44]

      *Id.* ¶ 114.

      Plaintiffs allege also that on May 13, 2008, defendant Reberger "finally admitted that 'there is no magic' behind the average $125 daily net win figure."  *Id.* ¶ 112.  The precise meaning and import of this statement, however, are not clear.

[45]

      *Id.* ¶ 116.

[46]

      *Id.* ¶¶ 68, 118-20.

[47]

      *Id.* ¶ 68(b); *see also id.* ¶ 61.

*Discussion*

*The Motion to Dismiss Standard*

In deciding a motion to dismiss, a court must accept as true all well pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiffs' favor.[48]  At the same time, "'[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss.'"[49]  A court must apply a plausibility standard: while "not akin to a 'probability requirement' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."[50]  The plaintiff must plead "factual allegations sufficient 'to raise a right to relief above the speculative level.'"[51]  Such motions are addressed to the face of the pleadings, but a court may consider also documents attached to the complaint as exhibits or incorporated into it by reference.[52]

For federal securities fraud claims, a plaintiff must "state with particularity the circumstances constituting fraud."[53]  The complaint must "(1) specify the statements that the

---

[48]
    *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[49]
    *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006).

[50]
    *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

[51]
    *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[52]
    *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

[53]
    FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4b (requiring that omissions and "state of mind" be pleaded with particularity; *see also Eternity Global Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 187 (2d Cir. 2004).

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[54]  Under the PSLRA, a plaintiff must state with particularity also "facts giving rise to a strong inference that the defendant acted with the required state of mind."[55]

*The Federal Securities Law Claims*

Under Rule 10b-5 and Section 10(b) of the Exchange Act, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with *scienter*; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiff[s'] reliance was the proximate cause of their injury."[56]

*Prime Mover Has Not Pleaded Transaction Causation Adequately*

"It is long settled that a securities-fraud plaintiff, must prove both transaction and loss causation."[57]  Transaction causation "is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations and omissions, the plaintiff would not have entered into the

---

[54]

      *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

[55]

      15 U.S.C. § 78s-4b(2).

[56]

      *Lentell v. Merrill Lynch & Co., Inc.* 396 F.3d 161, 172 (2d Cir. 2005); *see also* 17 C.F.R. § 240.10b-5.

[57]

      *Lentell*, 396 F.3d at 172 (quotation marks omitted) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)) .

15

detrimental securities transaction.'"[58]

Prime Mover has failed to state a claim for securities fraud because it has not alleged transaction causation – that is, the complaint fails to allege that Prime Mover purchased or sold any EGT stock during the period in which EGT's stock price allegedly was inflated by defendants' misstatements and omissions.[59]  This disposes of Prime Mover's claims in Counts 1, 2, 3, and 4.  In addition, its claims in Counts 6 (common law fraud), 7 (negligent misrepresentation), and 10 (unjust enrichment) must be dismissed for essentially the same reason: Prime Mover has not alleged that it was injured because it took any action, refrained from acting, or entered into any transaction, as a result of, or in reliance upon, the defendants' alleged misstatements or omissions during the relevant period.[60]  It therefore has not alleged that it was harmed as a result of the defendants' alleged misconduct or that the defendants were enriched unjustly at its expense.

Accordingly, Prime Mover's claims in Counts 1, 2, 3, 4, 6, 7, and 10 are dismissed. Prime Mover's only other claim – Count 5 (breach of fiduciary duty) – is disposed of below.

---

[58]

*Lentell*, 396 F.3d at 172 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).

[59]

The complaint states only that "[d]uring 2006 and the early part of 2007, Prime Mover and Strata made a number of purchases of [EGT's] common stock, which they continued to hold as of June 2007."  Cpt. ¶ 40.  Prime Mover did not participate in the SPA or the WPA.

[60]

Notably, with respect to the common law fraud claim, Prime Mover has not alleged also that it held EGT stock in reliance on defendants' misrepresentations when it otherwise would have sold that stock.

*Strata Has Not Pleaded Loss Causation Adequately With Respect to Most of the Alleged Misrepresentations*

Unlike Prime Mover, Strata claims to have relied on the defendants' alleged misstatements when it purchased EGT common stock at an allegedly inflated price in two private placements pursuant to (1) the SPA, on October 19, 2007, and (2) the WPA, on December 10, 2007. It therefore has alleged transaction causation. Its problems, however, are with loss causation.

Loss causation is analogous to proximate cause: it is "the causal link between the alleged misconduct and the economic harm ultimately suffered by the defendant."[61]  In *Dura Pharmaceuticals, Inc. v. Broudo*,[62] the Supreme Court held that in fraud-on-the-market cases, merely purchasing securities at "an inflated price will not itself constitute or proximately cause the relevant economic loss."[63]  Rather, plaintiffs must allege not only that the price was inflated by the fraudulent misrepresentation or omission, but also that the share price fell significantly after, and because, the truth became known:[64]

> "[T]o establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omissions concealed something from the market that, when disclosed, negatively affected the value of the security. . . .'"[65]

---

[61]

    *Lentell*, 396 F.3d at 172 (internal quotation marks and citations omitted).

[62]

    544 U.S. 336 (2005).

[63]

    *Id.* at 342.

[64]

    *Id.* at 347.

[65]

    *Id.* at 173 (emphasis in original) (citations omitted); *id.* at 175 ("[T]he complaint must allege facts that support an inference that [plaintiff's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that  plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.").

In other words, plaintiffs must allege "that the subject of the [misrepresentations], or any corrective disclosure regarding the falsity of [the misrepresentations, was] the cause of the *decline* in stock value that plaintiffs claim as their loss."[66]

Here, most of the misrepresentations alleged in the complaint could not have caused economic loss because the truth allegedly concealed by those misrepresentations did not become public until after August 13, 2008, by which time EGT's share price already had dropped to the lowest level alleged in the complaint.[67]

This is the case with respect to the alleged misrepresentations summarized in the first numbered paragraph on page 7 – that defendants repeatedly misrepresented that EGT had entered into a certain number of Participation Agreements for the Placement of EGMs at various gaming venues when the defendants knew that many if not all of those agreements were not "binding written

---

[66]

> *Id.*

> While the Second Circuit has not decided the issue specifically, it appears that a plaintiff need not allege subsequent sales of the securities purchased at inflated prices in order adequately to allege an economic loss for purposes of loss causation.  *See* 15 U.S.C. § 78u-4(e) (prescribing damage limitations that implicitly allow plaintiffs to hold shares past 90-day period); *Malin v. XL Capital Ltd.*, 2005 WL 2146089, at *4 (D. Conn. 2005) (recognizing that "a sale is not necessary or the only way a plaintiff could plead economic loss under the circumstances," but finding the allegations insufficient where no sale was alleged and the current stock "value [wa]s commensurate to the purchase prices"); *In re Royal Dutch/Shell Transport Secs. Litig.*, 404 F. Supp. 2d 605, 607-13 (D. N.J. 2005) (discussing statutory and policy considerations at length and holding that "[i]n order to plead and prove loss causation and economic loss, a plaintiff alleging fraud in connection with the purchase of securities is not necessarily required to sell the subject securities").

[67]

> Plaintiffs argue a materialization of the risk theory of loss causation in their papers, but the facts and allegations contained in the complaint all are directed toward a corrective disclosure theory and are insufficiently particular in either case.  In the same way that plaintiffs have not pleaded sufficiently specific disclosures causing particular changes to the stock price, they have not pleaded specific materializations of risks or how in particular such materializations caused the price decline generally alleged to have occurred in the spring and summer of 2008.

lease agreements" but instead "memoranda of understanding."[68]  The fact that these agreements were non-binding was not disclosed until November 2008,[69] well after EGT's stock had reached the lowest point pleaded in the complaint.  Nor does Strata allege that the fact that the agreements were non-binding ever became public.  Accordingly Strata has not alleged that either the non-binding nature of the agreements or the public disclosure thereof caused EGT's stock price to decline and resulted in economic loss to it.

The same is true also with respect to the defendants' alleged misrepresentations that (1) they intended to install, and later had installed, CasinoLink in EGMs that EGT placed at Asian gaming venues,[70] (2) EGT would receive, and was receiving, a minimum of 20 percent participation share of the net wins from its Asian venues,[71] (3) EGT would install the "best possible type" of EGM for each venue as determined by due diligence,[72] and (4) EGT's relationship with EGL afforded it special connections and access to sources of capital that would give it an advantage in the Asian gaming market.[73]  Strata alleges only one public corrective disclosure regarding the fact that EGT

---

[68]

      *See supra* note 24 and accompanying text.

[69]

      Cpt. ¶ 64.

[70]

      *See supra* note 25 and accompanying text.

[71]

      *See supra* note 27 and accompanying text.

[72]

      *See supra* note 28 and accompanying text.

[73]

      *See supra* note 30  and accompanying text.

had installed CasinoLink in only a portion of its EGMs in Asian venues.[74]  That disclosure allegedly

occurred on August 13, 2008, by which time EGT's stock already had dropped as far as is alleged

in the complaint.  Likewise, Strata has alleged that the misrepresentations regarding EGT's due

diligence on venues, selection of machines, and the relative benefits of its close relationship with

EGL were not corrected until November 2008 (and even then, it appears, only privately).[75]  And

Strata has not alleged specifically any corrective disclosure with respect to EGT's 20 percent

participation share of net wins.

The complaint insufficiently pleads loss causation with respect also to defendants'

alleged misrepresentations that they expected EBITDA margins to be as high as 60-90 percent.[76]

---

[74]

Cpt. ¶ 114 ("By August 13, 2008, when [EGT] finally revealed its net win reports by country, which were of course far short of the $125 day figure, and admitted that CasinoLink was only present in five venues of the fifteen it had opened, its stock was down 90% for the year.").

[75]

*See id.* ¶ 61 (plaintiffs discovered in "late 2008" that EGL's parent company had no intention of causing EGL to capitalize EGT's business by exercising its warrants); *id.* ¶ 68(b) (plaintiffs only learned in "the fourth quarter of 2008" that "Melco and [EGL] had no intention of paying cash to exercise the warrants"); *id.* ¶ 118 (on November 8, 2008, Chung admitted that the EGT had done no due diligence with respect to particular venues or markets); Pl. Mem. 18 ("The foregoing statements about the expertise of management and the extensive and venue-specific due diligence that Defendants had supposedly performed were revealed to be false in November 2008 . . . .").

[76]

*See supra* 29 note and accompanying text.

The complaint identifies three such statements as having been made prior to December 10, 2007.  Cpt. ¶ 52 (June 13, 2007, EGT press release: "Based on current projections, the growth in both numbers of gaming machines placed and EBITDA to [EGT] from this new revenue stream is expected to be 50% or greater in 2009."); *id.* ¶ 55(d) (June 14, 2007, conference call: Newburg stated in response to an analyst's question about gross profit margins a year out that "EBITDA margins will be something greater than 60% and the profit before tax margins will be something greater than 50%"); *id.* ¶ 93(g) (November 14, 2007, conference call: Reberger stated that EGT's "EBITDA margins are over 90%").

The allegations are vague as to when and how this alleged misrepresentation was disclosed.[77]  More importantly, Strata fails to allege with any specificity what effect any disclosure had on the market value of EGT's stock.  Such vague allegations are insufficient to plead loss causation.

Strata adequately has pleaded loss causation, however, with respect to one type of alleged misrepresentation: defendants' alleged statements, between June 13, 2007, and December 10, 2008, regarding the expected average net win rate for the EGMs placed in Asian venues.[78]

*Defendants' Alleged Misrepresentations Regarding Projected Net Win Rates Were Protected Forward-Looking Statements*

The complaint specifically identifies three alleged misrepresentations in the relevant time period in which defendants represented that they expected the EGMs placed at Asian venues to achieve an overall average net win rate of $125 for the first year of operation (rather than taking

---

[77]

Plaintiffs allege relevant disclosures in March and May of 2008, although they fail to provide any details as to the supposed May disclosure.  *See Id.* ¶ 59(g) ("Projected EBITDA figures were significantly overstated because, as Defendants were aware, they failed to take into account certain overhead expenses to which [EGT] had already contractually committed, including generous compensation packages for Yuen, Pisano and Reberger (as eventually became apparent from [EGT] disclosures in March and May 2008) . . . ."); *id.* ¶ 93(g) ("[EGT] did not enjoy, and had never enjoyed, EBITDA margins close to 90%.  In fact, at the time of the statement, [EGT] EBITDA margins were negative (as [EGT's] 2007 10-K, filed on March 31, 2008, eventually revealed.").

[78]

*See supra* 26 note and accompanying text.

Plaintiffs allege that on February 19, 2008, defendant Pisano, on behalf of EGT, stated that "[o]ur venues target daily net win per machine as $125.  For our modeling, we have assumed that at the end of one year, the machines on the floor will be achieving a $125 return."  Cpt. ¶ 105(i).  According to plaintiffs, "[t]his was the first time [EGT] stated that the $125 net win per day figure assumed a twelve month prior operating history" and "[i]n the days following . . . [EGT's] stock price fell, presumably reflecting investors' displeasure with the report that EGT now expected the average $125 daily net win per machine would take a year to achieve."  *Id.* ¶ 105(i)-106.

twelve months to achieve that net win rate).

First, in a June 13, 2007 press release, EGT stated that "[i]t is expected that by December 31, 2008, [EGL] will have secured placement of over 3,000 gaming machines on participation for [EGT] with an expectation of a net win rate per machine of approximately US$125."[79]  EGT's chief executive officer Newburg reiterated this projection in a conference call with analysts the next day: "by the end of '08 we will have 3,000 machines out there at an average net win per day of $125."[80]  Finally, in a conference call for analysts in November 2007, defendant Pisano again stated the company's expectation – in that instance referred to as an "assumption" – that EGT would achieve "net win of $125 over a 12-month operating period."[81]  As previously described, plaintiffs claim that the public first learned that the EGMs would not achieve this average daily rate until after they had been in operation for 12 months – rather than earning this daily average for the whole first year – on February 19, 2008, and that EGT's common stock dropped

---

[79]

    *Id.* ¶ 52.

[80]

    *Id.* ¶ 55(a); *see also id.* ¶ 55(b) ("If we look at the 125, that goes across a number of countries. . . . Many countries [are] involved.  That 125, we wanted to be a little conservative just to be sure that we don't disappoint anyone.  But it is a number we arrived at based on the number of units per country, per jurisdiction, and the net win per day per country.").

    The complaint states that "The Defendants" made essentially the same representation at a dinner meeting on September 7, 2007, that included Yuen, Pisano, Reberger, Patajo-Kapunan, and Peter Belton, the Managing Member and Portfolio Manager of Prime Mover.  *Id.* ¶ 67.  The complaint does not indicate which of these Individual Defendants made the representation.

[81]

    Weiss Decl. Ex. 13, at 3 (transcript of Nov. 15, 2007, conference call: "[B]ack in July, [EGT] provided some market guidance.  We provided four figures. . . .  And [fourth] we . . . provided an assumption for net win of $125 over a 12-month operating period."); *see also id.* ("The other . . . assumption of net win of $125 over 12-month operating period, with this number, Elixir developed a game performance metrics which provided for machine – machines to achieve this over a 12-month period."); Cpt. ¶ 93(b).

sharply and immediately as a result.[82]  The fact that the complaint adequately alleges loss causation

in this regard, however, does not get Strata all the way home.

These alleged misrepresentations regarding expected average net win rates fell within

the PSLRA's statutory safe harbor for forward-looking statements and therefore do not support a

securities fraud claim.  Under the PSLRA, "a defendant is not liable if the forward-looking statement

is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff

fails to prove that it was made with actual knowledge that it was false or misleading."[83]  Moreover,

pursuant to the PSLRA's heightened pleading standard,

---

[82]

Cpt. ¶¶ 105(i), 106.

[83]

*Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

Under the statute, a defendant "shall not be liable with respect to any forward-looking statement ..." if and to the extent that:

"(A) the forward-looking statement is-

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement-

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was-

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading."  15 U.S.C. § 78u-5(c).

"a plaintiff must plead facts to support a *strong* inference of *scienter*, 15 U.S.C. § 78u-4(b)(2), that is, the 'inference of *scienter* must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. Morever, because the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, 'the *scienter* requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.'"[84]

In making this determination, courts consider "whether a reasonable person would, based on the facts alleged . . . deem an inference that the defendants (1) did not genuinely believe [the statement], (2) actually knew that they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement, cogent and at least as compelling as any opposing inference."[85] In deciding questions of *scienter*, a court's "job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically."[86]

Here, the defendants' statements that they expected EGT to achieve an average net win rate per machine of $125 at some future time clearly were "forward-looking" within the meaning of the statute.[87] Moreover, plaintiffs have not alleged facts sufficient to make the requisite strong showing that the defendants who made these statements actually knew the statements were false when made. The facts alleged in the complaint, taken as a whole, do not support a strong

---

[84]  *Slayton*, 604 F.3d at 773 (internal citations omitted).

[85]  *Id.* at 775 (citing *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)).

[86]  *Id.*

[87]  *See* 15 U.S.C. § 78u-5(i)(1) (defining "forward-looking statement" as including "a statement containing a projection of revenues, income . . . , earnings . . . per share, capital expenditures, dividends, capital structure, or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management."); *Slayton*, 604 F.3d at 766-67 (discussing definition).

inference that Newburg, Pisano, or any of the EGT officers who might have written or approved the June 13, 2007 press release knew that the $125 net win per day projection was false or misleading when he or she stated or approved release of that projection on the occasions identified in the complaint.

Plaintiff's *scienter* allegations consist primarily of bald assertions that the defendants knew, or should have known, that they had no basis for asserting the expected $125 average net win figure[88] and that they lied in order to inflate EGT's stock price. Only one factual allegation comes close to suggesting a motive or potential concrete benefit to an Individual Defendant: "On or about June 15, 2007 [two days after the SPPPA was announced], Newburg exercised 367,333 options and made concurrent sales of [EGT's] stock into the market, selling all of the shares he received upon exercise of the options."[89] In other circumstances this sale might have been "unusual" and more strongly indicate a motive for misrepresenting aspects of EGT's new business venture.[90] That is not

---

[88]

See, e.g., Cpt. ¶ 55 ("During the [June 14, 2007] call, Newburg fielded questions from analysts and made numerous statements of material fact which he and others at [EGT] knew to be false . . . ."); *id.* ¶ 59(b) ("Among other things, Defendants knew . . . [t]hat they had no basis for the asserted $125 average net win figure at all, let alone for their repeated claims that it was 'conservative' . . . .").

Plaintiffs do allege that by March 27, 2008, "[d]efendants had received abysmal net win reports for the venues in Indochina (as Reberger ultimately admitted to [Prime Mover representative] Belton in a conversation in May 2008)." *Id.* ¶ 109. But this suggests nothing more than that representations that Reberger and others made in March 2008 – long after plaintiffs had purchased their shares – may have misrepresented then-present facts. It does not suggest that defendants who made the statements at issue here knew that their stated projections for future net win rates were inaccurate in the fall of 2007.

[89]

Cpt. ¶ 56.

[90]

See Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("[U]nusual insider trading activity during the class period may permit an inference of bad faith and *scienter*."); *see also In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 74 -75 (2d Cir. 2001) ("Factors considered in determining whether insider trading activity is unusual include the amount of

the case here, however.  A Form 8-K filed just a few days later publicly disclosed the transaction

and shows that Newburg maintained another 1.3 million options even after the sale.[91]  Moreover,

the complaint does not allege that Newburg or any other Individual Defendant sold additional EGT

stock during the more than 12 months during which plaintiffs allege EGT stock prices were inflated.

In all the circumstances, the mere fact that Newburg exercised roughly a fifth of his existing options

(not counting any stock he already may have owned outright) after the SPPPA was announced – and,

notably, well before nearly all of the alleged misrepresentations even took place and long before the

first alleged disclosure in February 2008 – does not create a strong inference that he actually knew

on June 14, 2007, that his statement regarding the expected net win rate for EGMs in the new

business model was false or misleading.[92]

        Because defendants have not sufficiently alleged facts creating a strong inference that

any of the defendants who made the three forward-looking statements at issue here actually knew

that those statements were false or misleading, those statements are protected by the safe harbor for

---

profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."); *id.* at 75 ("But none of these cases [regarding insider sales and motive allegations] established a *per se* rule . . . [r]ather, each case was decided on its own facts.").

[91]

        Weiss Decl., Ex. 6 (Form 8-K, dated June 19, 2007) ("On June 15, 2007, Mark Newburg, President and CEO, exercised 367,333 options and made concurrent sales into the market. Mr. Newburg took advantage of an open trading window to exercise options for estate planning purposes.  Mr. Newburg maintains approximately 1.3 million options and has no plans to exercise any additional options in the foreseeable future.").

[92]

        *Accord Acito*, 47 F.3d at 54 (finding *scienter* allegations insufficient as to outside director who sold 11% of his holdings days before a negative press release caused the stock price to plummet and where the other defendants did not sell stock during the class period); *In re eSpeed, Inc. Secs. Litig.*, 457 F. Supp. 2d 266, 289-92 (S.D.N.Y. 2006) (finding motive allegations insufficient as to defendants who sold 17.4% and 11%, respectively, of their stock holdings in the company during the putative class period where the other two individual defendants did not sell stock during the class period).

forward-looking statements and cannot form the basis for plaintiff's securities fraud claims.

*   *   *

Accordingly, all of plaintiffs' claims under the federal securities laws are dismissed.[93]

*The State Law Claims*

*Counts 3 and 4: Nevada Uniform Securities Act*

Counts 3 and 4 allege that the course of conduct described in the complaint violated also the Nevada Uniform Securities Act.

The specific statutory provision on which plaintiffs base their primary liability claim – Section 90.580 of the Nevada Revised Statutes – applies only if (1) an offer to sell securities originated in Nevada or an offer to purchase was made and accepted in Nevada,[94] and (2) those securities were not traded on a national stock exchange.[95] Here, the complaint states that EGT's common stock was traded on the America Stock Exchange at all times relevant to this motion, and plaintiffs have not alleged that defendants offered to sell, or that plaintiffs received and accepted an

---

[93]
> Plaintiffs' claims for "control person" liability under Section 20(a) of the Exchange Act fail also because plaintiffs have failed to state a claim for a primary violation.  *See Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010) ("Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law.  Because we hold that plaintiffs failed to state a claim for a primary violation against the defendants, we also hold that the District Court properly dismissed their § 20(a) claim against Mayer Brown." (internal citations omitted)).

[94]
> NEV. REV. STAT. § 90.830.

[95]
> *Id.* § 90.660(3) ("A person who willfully participates in any act or transaction in violation of NRS 90.580 is liable to a person who purchases or sells a security, other than a security traded on a national securities exchange or quoted on a national automated quotation system administered by a self-regulatory organization, at a price that was affected by the act or transaction for the damages sustained as a result . . . .").

offer to buy, EGT stock in Nevada.  Moreover, because plaintiffs have failed adequately to allege a primary violation under the Nevada Uniform Securities Act, they have not made out a claim for control person liability under the same statute.  Accordingly, Counts 3 and 4 are dismissed.

*Count 5: Breach of Fiduciary Duty*

Plaintiffs allege that all of the Individual Defendants owed plaintiffs fiduciary duties "by virtue of their status as directors or officers of [EGT], or of its controlling shareholder [EGL]" and that they breached those duties by (1) "making or approving the materially false and misleading statements" identified in the complaint, and (2) "recommending to the minority shareholders, and by causing [EGT] to enter into, transactions that [the Individual Defendants] knew or should have known . . . benefitted [EGL, Yuen] and others to the unfair detriment of plaintiffs and other minority shareholders of [EGT]."[96]  Plaintiffs assert that this is a direct rather than a derivative claim and that they therefore were not required to make a demand on the board or allege demand futility.[97]  The Individual Defendants argue the opposite, claiming that plaintiffs' fiduciary duty claims are derivative in nature and must be dismissed for lack of standing.

A shareholder may bring a direct claim – that is, a claim on his or her own rather than the corporation's behalf – only for "injuries that are independent of any injury suffered by the

---

[96]

Cpt. ¶¶ 143-44.

These allegedly detrimental transactions include "approval of [the SPPPA], the implementation of [the SPPPA], the abandonment of [EGT]'s pre-existing business in the United States, the private placements and conversion and exercise of warrants in October and December 2007, the acquisition from EGL of Stargames machines, and various agreements entered into as part of the Participation Business and the severance payment to Yuen."  *Id.* ¶ 144.

[97]

*See* Pl. Mem. 48-49.

28

corporation."[98]  By contrast, "[a] derivative claim is one brought by a shareholder on behalf of the corporation to recover for harm done to the corporation."[99]  "[A] shareholder must, before filing [a derivative] suit, make a demand on the board, or if necessary, on the other shareholders, to obtain the action that the shareholder desires," or he or she must allege facts indicating that such a demand would have been futile.[100]

Plaintiffs have alleged two distinct breaches by the defendants of their alleged fiduciary duties.  The claim based on the first – "making or approving the materially false and misleading statements" identified in the complaint – is direct in nature in that plaintiffs allege they were harmed individually when they bought stock at prices inflated by the defendants' misrepresentations and the price later declined.  That alleged injury was not felt by the corporation itself but only by certain shareholders, including Strata, who bought EGT stock at an allegedly inflated price as a result of the alleged misrepresentations.[101]  In order to make out this direct claim, however, Strata was obliged to allege facts which, if proved, would show the existence of a fiduciary

---

[98]

Cohen v. Mirage Resorts, Inc., 62 P.3d 720, 732 (Nev. 2003) (citing Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1244-45 (Del. 1999)).

Plaintiffs and defendants agree that Nevada law governs this claim.  See Pl. Mem. 47 n.36; Individual Def. Mem. [DI 32], at 20-21.

[99]

Cohen, 62 P.3d at 732.

[100]

Shoen v. SAC Holdings Co., 137 P.3d 1171, 1179 (Nev. 2006); id. ("[A] derivative complaint must state, with particularity, the demand for corrective action that the shareholder made on the board of directors (and, possibly, other shareholders) and why he failed to obtain such action, or his reasons for not making a demand.").

[101]

As previously explained, Prime Mover has not alleged that it purchased any EGT stock during the period in which the price allegedly was inflated.

duty by the defendants that ran to it directly.[102]   Strata has alleged no such facts.[103]   This portion of the fiduciary duty claim therefore fails.

The second alleged breach identified by plaintiffs – defendants' recommendation that shareholders vote for, and cause EGT to enter into, the SPPPA – states only a derivative claim.   The thrust of this argument is that EGT as a company, and its shareholders *pro rata*, suffered when the defendants caused it to enter into an agreement that changed its business model in a manner that benefitted the defendants to the ultimate detriment of the company.   This claim belongs to the corporation itself.   But plaintiffs have not alleged that they made a pre-suit demand on the board or

---

[102]

See *Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*, 376 F. Supp. 2d 385, 409 (S.D.N.Y. 2005) ("[A] shareholder may sue individually 'when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged.'" (quoting *Abrams v. Donati*, 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 783, 489 N.E.2d 751 (1985)); *Fifty States Management Corp. v. Niagara Permanent Sav. and Loan Assn.*, 58 A.D.2d 177, 179, 396 N.Y.S.2d 925, 927 (4th Dep't 1977) ("Where the injury to the stockholder results from a violation of a duty owing to the stockholder from the wrongdoer, having its origin in circumstances independent of and extrinsic to the corporate entity, the stockholder has a personal right of action against the wrongdoer. Absent such independent duty, however, the wrong suffered by the shareholder is deemed to be the same as the wrong suffered by the corporation and there is no shareholder right of action separate and apart from the corporate right of action." (internal citations omitted)).

[103]

The fact that the Individual Defendants owed fiduciary duties by virtue of their positions as corporate officers and directors does not mean that those duties were owed directly to Strata. The fiduciary duty owed by a director or officer as a result of his or her position is owed to the company itself.  *See* 18B AM. JUR. 2D *Corporations* § 1462 (2010) ("As a general rule, the fiduciary duties owed to shareholders of a corporation by directors and officers is owed to shareholders collectively and not individually."); *Leavitt v. Leisure Sports Inc.*, 103 Nev. 81, 86, 734 P.2d 1221, 1224 (Nev. 1987) ("A corporate officer or director stands as a fiduciary to the corporation.").   An officer or director may owe a fiduciary duty, by virtue of his or her control, directly to an individual shareholder only in limited circumstances not present here.  *See, e.g.*, *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995) ("By the time the termination and settlement agreements were signed, defendants were directors and, arguably, controlling shareholders of Spartech. They therefore owed a fiduciary duty to Powers, a fellow director and minority shareholder.").

that such a demand would have been futile.[104]  They therefore may not pursue this portion of their claim.

        Accordingly, plaintiffs' breach of fiduciary duty claims are dismissed.

*Count 6: Common Law Fraud*

        Plaintiffs assert that Nevada law governs all of their common law tort claims while defendants argue that New York law applies.  "In the absence of substantive difference [between two states' laws]. . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."[105]  Here the elements of common law fraud are substantially the same under New York and Nevada law.[106]  The Court therefore applies New York law, which requires that a plaintiff allege: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the

---

[104]

      *See* Pl. Mem. 47-49 (seeming to acknowledge that plaintiffs have not met the requirements for a derivative action).

[105]

      *Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

[106]

      "Under Nevada law, a plaintiff asserting a fraud claim must prove that (1) the defendant made a false representation (2) knowing or believing that the representation was false (or lacking a sufficient basis for making the representation), (3) intending to induce the plaintiff to act or to refrain from acting in reliance on the misrepresentation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) damage to the plaintiff resulted from such reliance."  *Weinstein v. Mortgage Capital Assocs., Inc.*, 2011 WL 90085, at *6 (D. Nev. Jan. 11, 2011).

      Plaintiffs seem to assume that New York, unlike Nevada, law requires a showing of actual knowledge to prove *scienter.  See* Pl. Mem. 44.  That is not the case.  Under New York law, the plaintiff must show that the misrepresentation made by the defendant was "either known by the defendant to be untrue or [was] recklessly made."  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001).

misrepresentation or material omission, and (4) injury."[107]

Here, as under Rule 10b-5, Strata's failure adequately to plead loss causation dooms its common law fraud claims with respect to most of the statements alleged to have inflated share prices between June 13, 2007, and December 10, 2007.[108]   As previously explained, Strata adequately has pleaded loss causation only with respect to the three statements allegedly made during that time period regarding expected net win rates for the EGMs that were to be placed pursuant to EGT's new business venture.[109]   While the federal statutory safe harbor for forward-looking statements does not itself protect such statements from common law fraud claims, essentially the same considerations – that is, the facts that (1) the statements were forward-looking statements of belief as to expected future net win rates, and (2) plaintiffs have alleged no facts, as opposed to conclusory assertions, showing that the defendants who made the statements did not believe them at the time – dictate dismissal here because the plaintiffs have not adequately alleged that these statements in fact were false.

Strata argues that the Court should infer falsity because (1) "defendants knew CasinoLink was not being installed, [therefore] they had no way of knowing what percentage of

---

[107]

*Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (internal quotation marks omitted).

[108]

Unlike federal securities law, New York common law in certain circumstances allows a plaintiff to recover on a fraud claim where the plaintiff was injured because he or she *held*, rather than bought or sold, securities in reliance on defendants' misrepresentations.  *See Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir. 1982); *In re WorldCom, Inc. Securities Litig.*, 382 F. Supp. 2d 549, 558 (S.D.N.Y. 2005).  Here, such a theory might implicate alleged misrepresentations made by the defendants even after the WPA closed.  Plaintiffs, however, have neither argued nor pleaded such a "holder" claim.

[109]

*See supra* notes 79 - 82 and accompanying text.

each venue's "net win" they were receiving;" (2) "it can be deduced [from EGT's Form 10-K, filed in March 2008,]that the maximum average net win per machine for the fourth quarter of 2007 was only $44;" (3) in May 2008, Reberger admitted to Prime Mover representatives that as early as March 2008 he had received bad net win reports for venues in Indochina;" and (4) when EGT issued results by country on August 13, 2008, the net win figures in all venues were substantially below the projected figures.[110]

None of this gives rise to an inference that the defendants knew at the times the statements were made – in June and November 2007, when the new business venture still was in its early stages – that they were false.  Strata's first argument illogically presumes that the defendants and venues had no means other than the CasinoLink electronic management system of calculating, or projecting, net win rates.  Even if the defendants knew at the time that CasinoLink was not being installed in all of the EGMs, that would not begin adequately to allege that they lacked any other basis for their projections and knew that the stated projections were false.  Defendants' other three arguments are similarly unavailing.  At most, they suggest that months after the relevant alleged misrepresentations certain of the defendants may have come to possess information that undercut the $125 average net win figure.  Strata has failed adequately to plead "falsity" with respect to these statements.

Accordingly, Strata's claim for common law fraud is dismissed.


*Count 7: Negligent Misrepresentatio*n

Because New York and Nevada law differ regarding the elements of negligent

---

[110]

Pl. Mem. 13.

misrepresentation,[111] the Court must decide which law applies.

Under New York choice of law rules, courts look to the jurisdiction with the greatest interest in regulating the tortious conduct at issue.[112]  Here, however, plaintiffs have not alleged sufficient facts for the Court to determine which jurisdiction has the most significant contacts with plaintiffs' tort claims.[113]  Nevada, California, and New York law each properly might govern,[114] but

---

[111]

As described below, New York law requires the plaintiff to show that a "special relationship" of trust and confidence existed between the plaintiff and the defendant.  Nevada law requires no such special relationship.  *See Ideal Elec. Co v. Flowserve Corp.*, 357 F. Supp. 2d 1248, 1255 (D. Nev. 2005).

[112]

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006) ("The New York Court of Appeals has defined "interest analysis" as requiring that "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied and ... the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."); *see also id.* at 384 -385 ("If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.").

[113]

Plaintiffs argue that the following contacts require application of Nevada law to all of plaintiffs' state law claims: (1) EGT is incorporated and headquartered in Nevada, (2) EGT issued fraudulent press releases from Nevada, (3) many of the Individual Defendants lived and worked in Nevada, and (4) the SPPPA closed in Las Vegas.  Pl. Mem. 44; *see also* Cpt. ¶ 62 (alleging that "A shareholders' meeting to vote on the [SPPPA] was called for September 10, 2007, in Las Vegas.").

[114]

EGT is a Nevada corporation, and several of the individual defendants were Nevada citizens. Certain of the alleged misrepresentations presumably were prepared in and made from EGT's headquarters in Nevada, and the SPPPA was approved at a shareholder meeting held in Las Vegas.  EGL, however, is based in Hong Kong, and the remainder of the individual defendants are citizens of various U.S. and foreign states.

The alleged injuries were felt by Strata in California, the seat of its principal place of business, and by its limited liability partners who were domiciliaries of various states.  *See* Cpt. ¶¶ 6-9.

The complaint indicates also, however, that "many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in [New York]."  *Id.* ¶ 32.

the facts alleged in the complaint are not adequate to determine with any degree of certainty which of these has the strongest interest in each claim.  In this circumstance, the Court applies the law of the forum specifically chosen by the plaintiffs – that is, New York.[115]

> Under New York law,
>
> "a negligent statement may be the basis for recovery of damages, where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage, but such information is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one to whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all."[116]

That is, "under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty."[117]  Such a "special relationship" requires "a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified."[118]

> Strata has not alleged any such special relationship between itself and any of the defendants.  As portrayed in the complaint, Strata was simply one more customer that relied on the

---

[115]

See *Conceria Vignola SRL v. AXA Holdings, LLC*, 2010 WL 3377476, *3 (S.D.N.Y. Aug. 3, 2010) (applying forum law where "[p]laintiff's allegations . . . do not clearly establish the "center of gravity" of the parties' contract"); *Bravado Intern. Group Merchandising Services, Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 193 n.14 (E.D.N.Y. 2009) ("Since the Complaint does not specify the location of the assets alleged to have been fraudulently conveyed by Schwartz, there is no way for the Court to make a choice of law determination with any certainty. Because plaintiffs have chosen to bring their action in New York, the Court has assumed that the law of New York applies.").

[116]

*White v. Guarente,* 43 N.Y.2d 356, 363-64, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977) (citation omitted).

[117]

*Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992) (citing *White v. Guarente,* 43 N.Y.2d 356, 362-63, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (2d Dept.1977)).

[118]

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003).

misrepresentations allegedly made by the defendants to the public when it purchased EGT's common stock, and warrants to purchase that stock, at inflated prices.  This is not the sort of "special relationship" on which to base recovery for negligent misrepresentation.   Accordingly, Strata's negligent misrepresentation claim is dismissed.

### *Counts 8 and 9: Breach of Contracts*

Under New York law,[119] "[i]n order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."[120]  "[A]n express warranty is part and parcel of the contract containing it and an action for its breach is grounded in contract."[121]

Strata claims that EGT breached the SPA, and that EGT and EGL breached the WPA, "by receiving and retaining performance due from Strata . . . when the representations and warranties made by [EGT, and, in the WPA, EGL] were untrue and inaccurate in numerous material

---

[119]     The SPA and WPA both contain clauses specifying that New York law shall govern all claims brought pursuant to the agreements.  *See* Weiss Decl., Ex. 15 (WPA), § 5.12; *id.* Ex. 24 (SPA) § 5.12.

[120]     *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

[121]     *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184-85 (2d Cir. 2007); *see also id.* at 185 ("A party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms.  It follows that appellant is entitled to the benefit of its bargain, measured as the difference between the value of [the company purchased by defendant] as warranted by Merrill Lynch and its true value at the time of the transaction." (internal citations omitted)).

respects."[122]  Specifically, it identifies six "representations and warranties" by EGT in the SPA, as well as two "representations and warranties" by EGL and seven by EGT in the WPA, that it alleges were breached.[123]  These breaches allegedly "caused damage to Strata, including but not limited to the loss of the money Strata paid to [EGT and EGL] pursuant thereto."[124]

*EGT's Warranties in the SPA*

Strata identifies the following six warranties in the SPA as allegedly having been breached by EGT:

1.  EGT's SEC filings up to that date had "complied in all material respects with the requirements of the [Exchange Act]" and did not contain misrepresentations or omissions of material fact;

2.  "[T]here ha[d] been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect" as defined in the contract;

3.  EGT was not and had not been "in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign,

---

[122]

Cpt. ¶¶ 163, 169.

Strata argues also that defendants breached the implied covenant of good faith and fair dealings by "interfering, unfairly and in bad faith, with Strata's right to receive the benefits of [the agreements]."  Cpt. ¶¶ 164, 171.  New York law, however, "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see also Pramer S.C.A. v. Abaplus Intern. Corp.*, 76 A.D.3d 89, 100, 907 N.Y.S.2d 154, 162 (1st Dep't 2010) (the lower court "correctly dismissed plaintiff's cause of action of breach of the implied covenant of good faith and fair dealing, as subsumed in the breach of contract action" where both were "based on the same underlying facts").

[123]

*See* Cpt. ¶¶ 88(a)-(f); 99-100.

[124]

*Id.* ¶¶ 166, 173.

federal, state and local laws applicable to its business;"

4.      EGT "possesse[d] all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct [its] business as described in the SEC reports;"

5.      "All disclosures furnished by or on behalf of [EGT] to the Purchasers regarding [EGT], its business and the transactions contemplated hereby, including the Disclosure Schedules to this Agreement, with respect to the representations and warranties made herein [were] true and correct" and did not omit any material fact; and

6.      No event, development, or circumstance had occurred or existed with respect to EGT that was required to be and had not been disclosed in its SEC filings.[125]

These warranties fall into two groups: (1) warranties that EGT had been and was in compliance with the federal securities laws and regulations (the first, third, and sixth warranties listed above), and (2) warranties unrelated to such compliance (the second, fourth, and fifth warranties).

With respect to the second group of warranties, Strata has not pleaded sufficient facts to make out any claim for breach.  The complaint does not allege any facts at all related to the fourth warranty – possession of appropriate certificates and permits – much less any suggesting that  it was false.

Strata's allegations regarding the second and fifth warranties are too vague to state a claim.  The complaint relates a long tale of allegedly fraudulent conduct and then simply asserts in a cursory manner that this whole course of conduct evidences breach of these two warranties. Strata does not state clearly which of the many events or occurrences alleged in the complaint

---

[125]        *Id.* ¶ 87(a)-(f).

reasonably could have been expected to result in "Material Adverse Effects."[126]  Nor does it state which disclosures furnished by EGT to Strata regarding EGT and the SPA were inaccurate.[127]  Even under Rule 8(a)'s forgiving pleading standard, such sparse allegations are insufficient to state a claim because they fail to put EGT on notice as to the nature and scope of the claims against it.[128]

Strata sufficiently has pleaded a breach, however, with respect to the first group of warranties.  The contract claim regarding this group tracks Strata's securities fraud claims – that is, Strata asserts that EGT breached the SPA by falsely warranting that it had not violated securities laws or regulations prior to the SPA's closing.  The fact that Strata's securities fraud claims fail primarily for lack of loss causation does not doom its breach of contract claim on the same basis.  If EGT breached an express warranty in the SPA then Strata was injured at the moment it purchased stock at an inflated price pursuant to that instrument, and it is entitled to recover the benefit of its bargain.[129]  Thus if EGT or its representatives in fact did make false statements of material fact in

---

126

    See Cpt. ¶ 88(b) ("In fact, by October 19, 2007, there had been numerous events, occurrences and developments that had had and could reasonably be expected to result in Material Adverse Effects, including the course of fraudulent dealings up to that date, as described above, and the tremendous, as yet undisclosed problems facing the implementation of the Participation Agreement.").

127

    See id. ¶ 88(e) ("In fact, the disclosures furnished by and on behalf of [EGT] to the Purchasers were replete with false and inaccurate statements of material facts, as described above.").

128

    See E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 32 (2d Cir. 2006) ("Notice pleading requires at a minimum that the pleading give the opposing party notice of the nature of the claim against it, including which of its actions gave rise to the claims upon which the complaint is based. The claim must be sufficiently particular to allow the defendant to commence discovery and prepare a defense.").

129

    "Under New York law, an express warranty is part and parcel of the contract containing it and an action for its breach is grounded in contract. A party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled

violation of the securities laws prior to the SPA's closing – even statements as to which Strata has failed to plead loss causation – then EGT breached that warranty as soon as the deal closed.  Giving Strata the benefit of every reasonable inference and in light of the allegations as a whole – particularly those regarding disclosures made to plaintiffs in November 2008[130] – Strata adequately has pleaded at least that certain material statements made publicly, and contained in documents filed with the SEC, by EGT and its representatives prior to the SPA were false and violated the securities laws.[131]

Because plaintiffs adequately have alleged breach of the first group of warranties, Strata's claim against EGT for breach of the SPA survives.

*EGT's Warranties in the WPA*

The same is true with respect to EGT's warranties in the WPA.  Strata identifies in the WPA a set of warranties by EGT equivalent to those described above – as well as one additional

---

[130]   according to its terms.  It follows that appellant is entitled to the benefit of its bargain, measured as the difference between the value of [the company purchased by defendant] as warranted by Merrill Lynch and its true value at the time of the transaction." *Merrill Lynch*, 500 F.3d at 184-85 (internal citations omitted); *see also id.* ("It is a well established principle that contract damages are measured at the time of the breach.").

[130]   *See supra* notes 46 - 47 and accompanying text.

[131]   To take but one example, Strata alleges that statements made by various defendants in the summer and fall of 2007 regarding the numbers of Participation Agreements entered into and placements secured were material and false because, as plaintiffs first learned in November 2008, most if not all of what defendants referred to as Participation Agreements in fact were non-binding "memoranda of understanding" that plaintiffs assert were not "Participation Agreements" within the meaning of the SPPPA.  *See supra* note 24 and accompanying text. Taking all reasonable inferences in favor of Strata, it adequately has pleaded that these allegedly false and material statements regarding placements and Participation Agreements – contained in numerous press releases, conference calls, and SEC filings in the summer and fall of 2007 – violated the securities laws and regulations.

warranty[132] – as having been breached.[133]

       For the reasons explained above with respect to the nearly identical set of warranties contained in the SPA, Strata has made out an adequate claim against EGT for breach of the WPA. If in fact certain of the defendants' statements and SEC filings on EGT's behalf leading up to the WPA contained materially false information, as adequately is alleged, then EGT breached at least one of its warranties in the WPA.

### *EGL's Warranties in the WPA*

       Strata identifies only two warranties by EGL in the WPA as having been breached: (1) "[t]hat [EGL] has not, and to its knowledge no one acting on its behalf has taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of EGT to facilitate the sale of the Warrants" and (2) that the "transfer and sale of the Warrants . . . do not and will not . . . conflict with or result in a violation of any law, rule [or] regulation . . . or other restriction of any . . . governmental authority to which [EGL] is subject (including federal and state securities laws and regulations)."[134]

       Strata's claim with respect to the former warranty essentially restates its securities

---

[132]

      EGT warranted also that it had not, and to its knowledge no one acting on its behalf had, "taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of [EGT] to facilitate the sale of the Warrants or the resale of any of the Warrant Shares." Cpt. ¶ 100(g). Plaintiffs allege that in fact EGT and the individual defendants had by that time "engaged in a sustained course of fraudulent dealings which had been intended to, and which did, artificially inflate EGT's stock price . . . ." *Id.*

[133]

      *Id.* ¶ 100(a)-(f).

[134]

      Cpt. ¶ 99(a)-(b).

fraud claims against EGL, except that here the warranty speaks only to specific intent or "design" – not recklessness – in manipulating EGT's stock and warrant prices. While *scienter* may be alleged "generally" under Rule 9(b),[135] "the relaxation of Rule 9(b)'s specificity requirement for *scienter* must not be mistaken for [a] license to base claims of fraud on speculation and conclusory allegations, and a plaintiff must still allege facts that give rise to a strong inference of fraudulent intent."[136] "When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite *scienter*."[137]

Here, the pleadings are insufficient to infer that any of the Individual Defendants, or any other individual whose *scienter* might be attributed to EGL for the summer and fall of 2007, had a concrete personal motive to manipulate the price of EGT's stock.[138] The complaint does not allege

---

[135]

FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Rule 9(b)'s heightened pleading standard applies here because the breach claim turns on whether fraudulent conduct adequately has been pleaded. *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." (internal citation omitted)).

[136]

*Vaughn v. Air Line Pilots Ass'n*, 377 Fed. Appx. 88, 90 (2d Cir. 2010) (internal quotation marks and citations omitted) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

[137]

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[138]

"The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *See Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). With respect to

42

that any EGL officer or director sold any EGT stock during the period in which the price allegedly was inflated or otherwise benefitted from the alleged inflation in any direct, personal way.[139]  In fact, the complaint alleges that EGL acquired, through the SPPPA's "earn-in" arrangement, far more EGT stock and options than it converted or sold during the period in which the price allegedly was inflated.  In the absence of allegations giving rise to a strong inference that EGL or any of its agents took actions designed to manipulate the price of EGT's stock and warrants, Strata's claim against EGL for breach of this warranty fails.

Strata's claim fails also with respect to the second warranty identified by Strata as having been breached by EGL.  Strata has not alleged how the sale of stocks and warrants pursuant to the WPA – as distinguished from any of the allegedly fraudulent conduct that preceded those sales – violated any particular law, rule, or regulation.  While this Court can conceive of theories on which such a claim might rest, it is the plaintiff's burden to plead its allegations with sufficient clarity to give defendants notice of the claim.  It has not done so here.

Accordingly, Strata's contract claim against EGL for breach of the WPA is dismissed.

---

specifically intended, rather than reckless, behavior, this is met where "the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; [or] (2) engaged in deliberately illegal behavior . . . ."  *Id.* at 311.

[139]

Plaintiffs allege that Lawrence Ho – an EGL director and the Chairman and controlling shareholder of EGL's parent company Melco – "personally received over two million warrants for the purchase of [EGT] stock" at the closing of the [SPPPA]."  Cpt. ¶ 82.  They do not allege, however, that Ho ever exercised or sold those warrants.

*Count 10: Unjust Enrichment*

Finally, plaintiffs allege that the defendants were unjustly enriched by plaintiffs' purchases of EGT stock at artificially inflated prices.[140]  As with negligent misrepresentation, New York and Nevada law vary slightly with respect to unjust enrichment claims.[141]  For the reasons described above, the Court applies New York law to Strata's claim.[142]

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."[143]  However, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[144]

Here, Strata has alleged only two purchases of EGT stock: those pursuant to the SPA

---

[140]

Specifically, plaintiffs allege that (1) they conferred a benefit upon the defendants by purchasing EGT's stock at artificially inflated prices, (2) "the revenue from those purchases went to EGT for the ultimate benefit" of the defendants, (3) defendants acknowledged and accepted that benefit, and (4) it would be inequitable to permit the defendants to retain that benefit.  Cpt. ¶¶ 175-77.

[141]

New York law requires that the plaintiff show a direct benefit to the defendant, whereas Nevada law allows recovery also where the benefit to the defendant was indirect.  *See Villa v. First Guar. Financial Corp.*, 2010 WL 2953954, at *5 (D. Nev. July 23, 2010) ("In Nevada . . . . [a]n indirect benefit will support an unjust enrichment claim.").

[142]

As previously explained, Prime Mover's claim necessarily fails because it has not alleged any purchase of EGT stock in the relevant time period.

[143]

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J. Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (internal quotation marks and citations omitted).

[144]

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190, 193 (1987); *see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005); *MJM Advertising, Inc. v. Panasonic Indus. Co.*, 741 N.Y.S.2d 874, 875 (N.Y. App. Div. 2002).

and the WPA, written contracts that govern those sales.  This precludes recovery for unjust enrichment at least with respect to EGT, which was a party to both agreements, and EGL for those claims based on the WPA to which it was a party.

The claim may be foreclosed on the same basis also with respect to the other defendants, who were not parties to the two contracts, and to EGL regarding shares purchased under the SPA.[145]  Even if it is not barred on this basis, however, Strata has not alleged a direct benefit to the other defendants of the type required to make out an unjust enrichment claim.[146]  Rather, Strata has alleged only that it "conferred a benefit upon the [defendants] by purchasing [EGT] stock at artificially inflated prices.  The revenue from those purchases went to [EGT] for the ultimate benefit of the [defendants]."[147]  This is not specific or direct with respect to EGL or the Individual Defendants.  Strata's unjust enrichment claim therefore is dismissed.

---

[145]

See *Taberna Capital Mgm't, LLC v. Dunmore*, No. 08 Civ. 1817, 2009 WL 2850685, at *3 (S.D.N.Y. Sept. 2, 2009) (finding that express contract terms that governed a dispute precluded also third party from recovering); *Law Debenture v. Maverick Tube Corp.*, No. 06 Civ. 14320, 2008 WL 4615896, at *12-13 (S.D.N.Y. Oct. 15, 2008) (surveying cases and concluding that under New York law "a claim for unjust enrichment, even against a third party, cannot proceed when there is an express agreement between two parties governing the subject matter of the dispute").

[146]

See *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (unjust enrichment claim requires an allegation of a "specific and direct benefit" received by the defendant); *Simon v. Keyspan Corp.*, 2011 WL 1046119, at *12 n.143 (S.D.N.Y. Mar. 22, 2011) ("Plintiff's unjust enrichment claim . . . must be dismissed on the ground that plaintiff has failed to allege that defendants received a "specific and direct benefit" from plaintiff.").

[147]

Cpt. ¶ 175.

45

*Conclusion*

For the foregoing reasons, defendants' motions to dismiss [DI 29, 31, 39] the amended complaint are granted to the extent that (1) all of Prime Mover's claims are dismissed and (2) all of Strata's claims are dismissed except for Counts 8 and 9 against EGT.  The motions are denied in all other respects.

SO ORDERED.

Dated:          June 22, 2011

_____
                    Lewis A. Kaplan
            United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)