UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PRIME MOVER CAPITAL PARTNERS L.P., et al.,

               Plaintiffs,

       -against-                             10 Civ. 2737 (LAK)

ELIXIR GAMING TECHNOLOGIES, INC., et al.,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

       Appearances:

               Daniel A. Osborn
               OSBORN LAW, P.C.
               *Attorney for Plaintiffs*

               Paul R. Bessette
               Michael A. Piazza
               Jesse Z. Weiss
               GREENBERG TRAURIG LLP
               *Attorneys for Defendant Elixir Gaming Technologies, Inc.*
               *and the Individual Defendants*

               David J. Schindler
               Robert W. Perrin
               Matthew L. Kutcher
               Cameron Smith
               LATHAM & WATKINS LLP
               *Attorneys for Defendant Elixir Group Limited*

LEWIS A. KAPLAN, *District Judge.*

       This is an action for damages in connection with plaintiffs' purchases of shares of

Elixir Gaming Technologies, Inc. ("EGT").  Plaintiffs sue under Sections 10(b) and 20(a) of the

2

Securities Exchange Act of 1934 (the "Exchange Act")[1] and Rule 10b-5 thereunder,[2] the Nevada Uniform Securities Act, and on various common law theories.  They claim that the defendants made material misrepresentations that (1) inflated EGT's share price, (2) caused them to purchase and hold EGT shares at that inflated price, and (3) injured them when the truth was made public and led to a decline in EGT's share price.

The Court previously dismissed certain defendants from the case[3] and dismissed the majority of the claims in their amended complaint without prejudice.  Plaintiffs then sought leave to amend.  The matter is now before the Court on motions to dismiss the second amended complaint ("SAC") for failure to state a claim upon which relief may be granted by the remaining defendants – EGT, Elixir Group Limited ("EGL"), and the individual director and/or officer defendants (the "Individual Defendants").[4]

*Facts*

---

[1]
    15 U.S.C. §§ 78j(b), 78t(a).

[2]
    17 C.F.R. § 240.10b-5.

[3]
    The motion of defendants Melco International Development Limited ("Melco") and Lawrence Ho to dismiss the action for lack of personal jurisdiction [DI 35] already has been granted.  *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 761 F. Supp. 2d 103 (S.D.N.Y. 2011).

[4]
    DI 80, DI 82, DI 85.

I.    *The Parties*

    A.    *Plaintiffs*

Plaintiffs are hedge funds that allegedly "invested in the securities of EGT and suffered millions of dollars in damages" as a result of defendants' alleged misstatements.[5]

Plaintiff Prime Mover Capital Partners L.P. ("Prime Mover") allegedly purchased EGT shares on June 13 and June 22, 2007.[6]

Plaintiffs Strata Fund L.P., Strata Fund Q.P., L.P., and Strata Offshore Fund, Ltd. (collectively, "Strata") purchased EGT shares at various times in 2007.[7]  Some of these shares were purchased in private placements pursuant to two separate agreements: (1) a Securities Purchase Agreement ("SPA") executed by EGT and certain purchasers, including Strata, on October 19, 2007, and (2) a Warrant Purchase Agreement ("WPA") executed by EGT, EGL, and certain purchasers, including Strata, on December 10, 2007.[8]

    B.    *Defendants*

EGT is a corporation organized under the laws of and having its principal place of

---

[5]      *Id.* ¶ 1; *see also id.* ¶ 4.

[6]      *Id.* ¶¶ 66, 82.

[7]      *Id.* ¶¶ 81, 83, 85, 90, 93, 100, 123, 124, 142, 153.

[8]      *Id.* ¶¶ 127-29; 147-50.

4

business in Nevada.[9]  At all relevant times, its stock has traded on the American Stock Exchange.[10]

EGL is a corporation organized under the laws of and having its principal place of business in Hong

Kong.[11]  Each Individual Defendant was a director and/or officer of EGT and/or EGL during the

relevant period.[12]

## II.     *The Securities Purchase and Product Participation Agreement*

On or about June 13, 2007, EGT announced that EGT and EGL had entered into the

Securities Purchase and Product Participation Agreement (the "SPPPA").[13]  Under its terms, EGT

was to become a 75 percent owned subsidiary of EGL pursuant to an "earn-in" arrangement by

which EGL would gain an equity interest in EGT based on the number of electronic gaming

machines ("EGMs") EGT placed with gaming operators in Asia, pursuant to participation

agreements to be secured by EGL.[14]

The SPPPA included specific "milestones."  For example, once EGL secured "the

Placement of 1,000 EGMs," EGT would "(i) issue to EGL 25,000,000 shares of EGT's stock; (ii)

reduce the exercise price of each of 10,000,000 of the 2006 Warrants [which EGL had purchased

---

[9]     *Id.* ¶ 10.

[10]    *Id.*

[11]    *Id.* ¶ 11.

[12]    *Id.* ¶¶ 12-24.

[13]    *Id.* ¶ 46.

[14]    *Id.* ¶ 47.

5

from EGT in October 2006], by one dollar each; and (iii) amend the terms of the 2006 Warrants to make them freely transferable."[15]  The second milestone provided that EGL would receive another 15 million shares of EGT stock and additional reductions in warrant exercise prices when EGT had "entered into Participation Agreements for the Placement of a Cumulative Total of 2,000 EGMs" and when "actual Placement of a Cumulative Total of 1,000 EGMs" had been achieved.[16]

      EGT's shareholders approved the SPPPA on September 10, 2007.[17]

III.     *The Allegedly False and Misleading Statements*

      Plaintiffs allege that many statements in the June 13, 2007 Form 8-K and press release that disclosed the SPPPA – as well as many subsequent statements made by defendants –

---

[15]

    *Id.* ¶ 48.

[16]

    *Id.* ¶ 49.

    Several important terms in the SPPPA are defined in the SAC.

    "Participation Agreement" was defined as "a written lease agreement between [EGT] and a Qualified Lessee, pursuant to which EGT leases an EGM to the Qualified Lessee, for a minimum period of three years, and the Qualified Lessee agrees to (a) locate in the Qualified Lessee's public gaming area and make available to the gaming public the EGM, and (b) pay to [EGT] at least 20% of the Net Win for the operation of the EGM." *Id.* ¶ 52.

    "Cumulative Total" was defined as "(a) when used in the context of Participation Agreements for the Placement of EGMs, the total number of EGMs subject to Placement under Participation Agreements that are in full force and effect, and where the Qualified Lessee is not then in material breach thereof, and (b) when used in the context of the Placement of EGMs, the total number of EGMs subject to Placement net of any EGMs previously subject to Placement that have been removed from operation by the Qualified Lessee." *Id.* ¶ 53.

[17]

    *Id.* ¶ 106.

were false and misleading.[18]  For the purposes of this motion, the relevant statements are those made between June 13, 2007, when the SPPPA was first announced, and December 31, 2007, when Strata made its final purchase of EGT stock.[19]

These alleged false and misleading statements are easily grouped into nine categories:

1.  Defendants stated that they had entered into "binding written lease contracts, called 'Participation Agreements,'" for the placement of thousands of EGMs at Asian gaming venues when the agreements in fact were non-binding "memoranda of understanding."[20]

2.  Defendants stated that they had "arranged to 'Place' (and, later, that they had 'Placed') thousands of EGM's."  However, the number of EGMs "that ever went into operation was materially smaller than Defendants stated."[21]

3.  Defendants claimed that software called "CasinoLink" would be installed in each EGM placed in the Asian gaming venues, thereby allowing EGT to monitor those units and obtain data to improve its marketing and profitability.[22]

4.  Defendants represented that they expected the EGMs placed in the Asian gaming venues to generate a profit, or "net win," of $125 per day per

---

[18]  In total, plaintiffs allege that the SAC identifies "at least 110 misrepresentations and omissions made by EGT and the other defendants in furtherance of their scheme."  DI 90, at 4; *see id.* at Appendix.

[19]  Plaintiffs now allege that the defendants made material misrepresentations between June 13, 2007 and May 13, 2008.  *E.g.*, SAC ¶ 201.  For present purposes, however, only those misrepresentations that predated plaintiffs' stock purchases are relevant.

[20]  SAC ¶ 3(a); DI 90, at 4-5 (citing SAC ¶¶ 68(f), 78, 94, 97, 98, 101, 103(e), 104, 121,125, 126, 121, 183(a), 144, 152, 154(c)).

[21]  SAC ¶ 3(b); DI 90, at 5 (citing SAC ¶¶ 94, 103(c), 104, 108, 116, 132, 135, 136, 145, 154(d), 158, 159).

[22]  SAC ¶ 3(c); DI 90, at 5 (citing SAC ¶¶ 138(e), 144, 150(b), 154(a), 154(b)).

machine.[23]

5.      Defendants claimed that EGT would receive (and was receiving) at least a 20 percent participation share of the "net win" from the venues.[24]

6.      Defendants claimed that EGT would supply (and later supplied) the "best possible type of machine" for each venue, "based on extensive due diligence with respect to each venue."[25]

7.      Defendants represented that EGT's average cost for placing each machine would be $20,000.[26]

8.      Defendants stated that EGT had earnings before interest, taxes, depreciation, and amortization ("EBITDA") margins as high as 60 to 90 percent.[27]

9.      Defendants claimed to have "access to significant sources of capital to fund and expand its Participation Business."[28]

## IV.    *Alleged Disclosures*

The SAC alleges that various disclosures between February and May 2008 revealed the inaccuracy of defendants' prior statements and led to the decline in EGT's share price.  It alleges also that these disclosures led to "the materialization of the risks about EGT and the Participation

---

[23]

      SAC ¶ 3(d); DI 90, at 5 (citing SAC ¶¶ 62, 63, 68(a), 68(b), 68(d), 69, 73, 76, 77, 87, 99, 102, 138(b), 159).

[24]

      SAC ¶ 3(e); DI 90, at 5 (citing SAC ¶¶ 133, 138(f), 158).

[25]

      SAC ¶ 3(f); DI 90, at 5-6 (citing SAC ¶¶ 77, 98, 99, 103(d), 128, 138(c), 138(e), 141, 143, 150(c)).

[26]

      SAC ¶ 3(g); DI 90, at 6 (citing SAC ¶¶ 99, 143).

[27]

      SAC ¶ 3(h); DI 90, at 6 (citing SAC ¶¶ 64, 68(e), 138(g)).

[28]

      SAC ¶ 3(i); DI 90, at 6 (citing SAC ¶¶ 75, 79, 91, 92, 101, 103(a), 103(b)).

8

Business that Defendants' numerous misrepresentations . . . had been intended to, and did conceal."[29]

During a conference call on February 19, 2008, EGT disclosed additional information about the "net-win" rate.  Defendant Pisano stated that "'[f]or our modeling, we have assumed that at the end of one year, the machines on the floor will be achieving a $125 return.'"[30]  The SAC alleges that "[t]his was the first time EGT stated that the $125 net win per day figure assumed a twelve month prior operating history" and that "it represented a dramatic departure from the representations EGT, EGL, and their representatives had consistently adhered to since June 12, 2007 that the daily net win of $125 would be, and had been, the average over the first year of operation."[31] Between February 19 and February 22, 2008, the price of EGT's stock dropped from $4.25 per share to $3.47 per share.[32]

Less than a week later, on February 25, 2008, defendant Reberger stated that "'as of February 19, 2008, EGL had installed 1655 gaming devices across 15 venues'" but noted also that "'of those 1655 installed units . . . approximately 1107 are facilities that are open to the market and are earning revenue for both the operator and EGT.'"[33]  He explained the difference between the number of EGMs placed and the number in operation by noting that EGT "'anticipates there is a

---

[29]      SAC ¶ 164.

[30]      *Id.* ¶ 163.

[31]      *Id.* ¶ 164.

[32]      *Id.* ¶ 166.

[33]      *Id.* ¶ 168.

90-day [lag] between the time the machines are installed and the time that [the] . . . machines become operational.'"[34] The SAC alleges that this statement about the number of machines "in operation" "was the first disclosure to begin to correct previous misrepresentations" about the number of EGMs "[p]laced" in gaming areas as defined by the SPPPA[35] because "Plaintiffs and other investors in EGT stock reasonably understood Defendants' statements about the number of 'placements' or of EGMs 'placed' to mean that all such EGMs were in operation and earning revenue for EGT."[36]

During the same February 25, 2008 call, defendant Pisano attributed some of the lag time between EGM placement and operation to "inexperienced venue operators, stating 'what we've found, and this is reflected in our $125 per day net win with the new business, these are also new operators, and they take time to learn the business.'"[37]  Plaintiffs claim that this disclosure undercut earlier representations about the thoroughness of EGT's "due diligence and familiarity with the markets they were attempting to penetrate."[38]  By March 27, 2008, EGT's stock had fallen $2.28 per

---

[34]

  *Id.* ¶ 170.

[35]

  *Id.*; *see also id.* ¶ 51 (defining "placement" in the SPPPA as "'a Qualified Lessee's full-time operation of an EGM in its public gaming area pursuant to a Participation Agreement (subject to any temporary closure of such public gaming area for a period of up to three months as may be required in order to comply with applicable Legal Requirements or due to any public safety reasons or such other causes which are beyond the reasonable control of the relevant Qualified Lessee).'").

[36]

  *Id.* ¶ 168.  The SAC alleges also that the disclosure about the number of machines in operation renders EGT's EBITDA projections a "a mathematical impossibility."  *Id.* ¶ 171.

[37]

  *Id.* ¶ 172.

[38]

  *Id.*

share, representing a 35 percent decline between February 25 and March 27, 2008.[39]

On March 27, 2008, EGT conducted another conference call, during which defendant Reberger stated that the delays between placement and operation depend on several factors, including (1) the operators' discretion, (2) delays due to construction or renovation at the gaming venue, and (3) obtaining the necessary regulatory approvals or business licenses.[40]  Moreover, the SAC alleges that he "obliquely corrected the stated cost of the machines," stating that "'[t]he depreciation at the moment is $14 per day per machine'" and that "[t]his figure implied a total landed cost of $25,550, over 25% above the numbers that had been given."[41]  EGT's share price dropped from $2.28 per share on March 27, 2008 to $1.91 the next day, representing a 16 percent decline.[42]

On or about March 31, 2008, plaintiffs allege that EGT disclosed additional information in its 2007 Form 10-K.[43]  First, the 2007 Form 10-K – like some of the previous disclosures – noted that "placed" EGMs were different from EGMs "in operation," stating that "'[w]e expect that the time from the initial execution of the contract until the commencement of electronic gaming machine participation at the particular venue will be approximately six to nine

---

[39]

    *Id.* ¶ 174.

[40]

    *Id.* ¶ 176.

[41]

    *Id.* ¶ 177.

[42]

    *Id.* ¶ 178.

[43]

    *Id.* ¶¶ 179-81.

months.'"[44]  Second, plaintiffs allege that the 2007 Form 10-K revealed that, despite alleged prior

statements to the contrary, "CasinoLink had not been installed on every EGM and that machines had

been and were being placed in operation without CasinoLink, leaving the [EGMs] open to theft and

manipulation."[45]  Specifically, the Form 10-K disclosed that "'[t]he risk of collecting the revenue

rightfully due under the revenue share arrangement and protecting our gaming machine assets is

heightened where delays are experienced by Elixir Group in installing a casino management system

once a venue is in operation which has happened in the past.'"[46] Third, the Form 10-K stated that

"'we have very limited past business relationships with the venue operators and assume that the

venue operators are reputable.'"[47] Plaintiffs allege that this statement contradicted "EGT's prior

boasts of extensive due diligence and familiarity with the markets, and EGT's stated assumption

'that the venue operators are reputable.'"[48]

      Although plaintiffs now allege that the relevant period ended on May 13, 2008,[49]

---

[44]    *Id.* ¶ 179.

[45]    *Id.* ¶ 180.

[46]    *Id.*

[47]    *Id.*

[48]    *Id.*

[49]    The SAC alleges also that during a May 13, 2008 conference call, defendant Reberger "finally admitted that 'there is no magic' behind the average $125 daily net win figure that Defendants had been resolutely reaffirming since June 2007." *Id.*  ¶ 185.  The precise meaning of this statement, as the Court noted in its previous opinion deciding the motions to dismiss the amended complaint, is not clear. *Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d at 661 n.44.  Moreover, the SAC alleges that on May 22, 2008, Defendant Reberger admitted in a private conversation that most of the EGMs that had gone into operation had not been equipped with CasinoLink.  *Id.*

EGT's stock reached its lowest point alleged in the SAC on August 19, 2008.[50]  It was not until October 2008, however, that EGT and EGL announced that they decided to discontinue their joint Asian gaming venture "and not [to]. . . proceed with the final three phases of the SPPPA.[51]  Then, on November 8, 2008, certain Individual Defendants allegedly admitted for the first time that "persons charged with the promotion of the [EGM] business were unqualified and had little or no experience in, or familiarity with, the markets they were supposed to be penetrating," that no due diligence had been done with respect to particular venues or markets, and that the agreements between EGT and the gaming venues "were contained only in 'memoranda of understanding'" rather than "binding written lease agreements."[52]

## V.    This Motion

This matter again is before the Court on motions to dismiss by EGT, EGL, and the Individual Defendants for failure to state a claim upon which relief can be granted.  Defendants assert that the Exchange Act claims should be dismissed because many of the alleged misstatements were "forward-looking statements" that fell within the safe harbor provision of the Private Securities Litigation Reform Act ("PSLRA") and that plaintiffs fail adequately to allege materiality, *scienter*, and loss causation.  They argue that the Nevada Uniform Securities Act claims should be dismissed

---

Plaintiffs assert, however, that these additional allegations made after March 31, 2008 show falsity and *scienter* but not loss causation.  DI 90, at 2.

[50]    SAC ¶ 192.

[51]    *Id.* ¶ 194.

[52]    *Id.* ¶ 197.

for substantially the same reasons.  They assert also that the common law claims are deficient. Moreover, EGL argues that the SAC fails adequately to allege any breach of the WPA, and the Individual Defendants assert that the fiduciary duty claim fails as to them.

*Discussion*

I.    *The Standard*

To survive a Rule 12(b)(6) motion, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face."[53]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[54]  The Court accepts as true all well-pleaded factual allegations, and "draws all inferences in the plaintiff's favor."[55]  In deciding a motion to dismiss, a court considers the complaint and "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."

For federal securities fraud claims, the pleading standards of Rule 9(b) and the

---

[53]    *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[54]    *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556).

[55]    *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotation marks and citation omitted).

PSLRA must be satisfied.[56]   Accordingly, a securities fraud complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.[57]  In pleading *scienter*, the PSLRA requires that the complaint "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[58]  This requirement may be satisfied by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[59]   "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."[60]  For an inference to be sufficiently strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw

---

[56]

       FED. R. CIV. P. 9(b); *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) ("[P]rivate securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal.").

[57]

       *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 170 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *see also* 15 U.S.C. § 78u-4(b)(1) (complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

[58]

       15 U.S.C. § 78u-4(b)(2).

[59]

       *ATSI Commc'ns Inc.*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).

[60]

       *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

from the facts alleged."[61]  Rule 9(b) imposes similar requirements with respect to averments of fraud in connection with claims asserted on common law and state statutory bases.

## II.    *Federal Securities Claims (Counts 1 & 2)*

Under Rule 10b-5 and Section 10(b) of the Exchange Act, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with *scienter*; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiff[s'] reliance was the proximate cause of their injury."[62]

### A.    *Plaintiffs Again Fail to Plead Loss Causation With Respect to Some Alleged Misstatements*

In *Dura Pharmaceuticals, Inc. v. Broudo*,[63] the Supreme Court held merely purchasing securities at "an inflated price will not itself constitute or proximately cause the relevant economic loss" in fraud-on-the-market cases.[64]  Rather, to plead loss causation adequately, a plaintiff must allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omissions concealed something from the market that, when

---

[61]

     *Id.*

[62]

     *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005); *see also* 17 C.F.R. § 240.10b-5.

[63]

     544 U.S. 336 (2005).

[64]

     *Id.* at 342.

disclosed, negatively affected the value of the security . . . .'"[65]

In this Circuit, loss causation may be established by pleading and proving either (1) a corrective disclosure or (2) a materialization of a concealed risk.[66]  On the latter theory, the complaint must allege that the loss was (1) foreseeable and (2) caused by the materialization of the concealed risk.[67]  A loss is foreseeable if it is "within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor."[68]

### 1.    *Materialization of the Risk*

In its previous decision, the Court noted that the  falsity of many of the alleged misstatements was not disclosed until after EGT's stock reached its lowest point and that plaintiffs therefore had failed adequately to plead loss causation.[69]  Plaintiffs attempt to surmount this hurdle by alleging that defendants' disclosures that began on February 19, 2008 led to a "materialization of the risk."[70]  Despite the fact that plaintiffs have added some factual allegations in support of their argument, they still have not alleged loss causation adequately.

---

[65]

*Lentell*, 396 F.3d at 173.

[66]

*In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).

[67]

*See, e.g.*, *Lentell*, 396 F.3d at 173.

[68]

*In re Flag Telecomm. Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[69]

*Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d at 665-66.

[70]

DI 90, at 21.  Plaintiffs did not allege any facts regarding the materialization of the risk in their amended complaint, but they asserted this argument in their memoranda.  *Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d at 663 n.67.

Plaintiffs now allege that the February 19, 2008 disclosure that the $125 net-win figure was to be achieved "at the end of one year," as opposed to an "average over the first year of operation," "marked the beginning of the materialization of the risks about EGT and the Participation Business."[71] Specifically, they allege that this disclosure brought to light the allegedly concealed risks that (1) "EGT and EGL did not understand the relevant markets or have the right machines in those markets," (2) "revenue received by EGT might not be sufficient to cover its depreciation costs," (3) "EGT might not have cash flow sufficient to purchase the number of EGMs needed to meet the contracts' that had supposedly been entered into place those EGMs in various venues," (4) "EGT's EBITDA margins would not approach, let alone meet, Defendants' earlier projections," and (5) "robust support for the Participation Business from Melco and the Ho family was not forthcoming."[72]

The problem with this argument is that none of these risks was concealed by the alleged inaccuracy of the $125 net-win figure. Indeed, as noted below, the statements about the $125 net-win rate were forward-looking statements that included cautionary language. Moreover, in its SEC filings and conference calls, defendants repeatedly warned of risks that projections – including the $125 net-win rate – would not be met.[73] Plaintiffs' materialization of the risk

---

[71]    SAC ¶¶ 163-64.

[72]    *Id.* ¶ 164(a)-(e).

[73]    *See, e.g.*, Bajwa Decl. [DI 84], Ex. 6, at 2 ("Those forward-looking statements include statements regarding expectations for the transaction between VendingData and Elixir . . . [and] the Company's expectations for future product revenue. Such statements are subject to certain risks and uncertainties, and actual circumstances, events or results may differ materially from those projected in such forward-looking statements. Factors that could cause or contribute to differences include . . . risks relating to Elixir's ability to place games that generate the expected amount of net-win."); *see id.* Ex. 1, at Ex. 99-2, Exs. 2-5.

argument therefore fails sufficiently to allege loss causation.

### 2.      *Corrective Disclosures*

As plaintiffs' materialization of the risk theory fails, they rely also on the theory that corrective disclosures caused a decline in EGT's stock price.  As with the amended complaint, however, the SAC fails adequately to allege that corrective disclosures were made about many of the alleged misstatements before EGT's stock price reached the lowest point alleged in the SAC.

First, the SAC alleges that it was not disclosed until November 8, 2008, well after EGT's stock reached its lowest point on August 19, 2008, that "arrangements between EGT and the venues concerning the EGMs were contained only in 'memoranda of understanding' which were not binding and could not be enforced by either EGT or the venue owners."[74]  This disclosure, moreover, was made in a private conference call, and there is no allegation that it ever became public.[75]  Thus, the SAC fails to allege that the disclosure of the non-binding nature of the agreements caused them any loss.[76]

Second, the SAC fails to allege that the truth about three categories of alleged misstatements *ever* was revealed.  Nowhere in the SAC is it alleged that defendants revealed the

---

[74]     SAC ¶ 197.

[75]     *Id.* ¶ 195.

[76]     *See Prime Mover Capital Partners*, 793 F. Supp. 2d at 665 (S.D.N.Y. 2011); *see also Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 597 (S.D.N.Y. 2008) ("logic dictates that the disclosure must, at the very least, be public enough to reach the market in order for the market to react negatively to the revelation of the truth underlying the alleged misrepresentations"); *Master v. GlaxoSmithKline* 71 F. App'x 46, 51 (2d Cir. 2008) ("stock drop [which] occurred after the close of the class period . . . cannot be relied upon for loss causation").

"truth" with respect to the allegedly false statements that: (1) EGT would receive a minimum of 20 percent participation share of the net win, (2) EGT, through Melco and EGL, had access to significant sources of capital, and (3) EGT would supply the best possible type of EGM based on due diligence.[77]  Because the alleged "truth" about these misstatements never was alleged to have reached the market, they could not have caused a decline in EGT's stock.  Plaintiffs' failure to allege corrective disclosures is fatal to their allegations concerning these alleged misstatements.[78]

Finally, plaintiffs' allegations regarding the disclosures that (1) the cost of placing each EGM would be $20,000, and (2) CasinoLink was not installed on every EGM are vague and lack the requisite specificity.  With respect to the cost of placing EGMs, the SAC alleges only that defendant Reberger "obliquely corrected the stated cost of the machines" by stating that "[t]he depreciation at the moment is $14 per day per machine."[79]  While plaintiffs allege that "[t]his figure *implied* a total landed cost of $25,550," it is not even remotely clear why that is so, let alone that the statement was sufficiently clear to have constituted a corrective disclosure.[80]  The same is true with

---

[77]

> The SAC alleges that various corrective disclosures about the $125 net-win figure show that the defendants lacked diligence and expertise.  Disclosures that various projections were lower than expected, however, are too vague to constitute corrective disclosures about defendants' expertise or diligence.  Indeed, it wasn't until November 8, 2008 in a private conference call that defendants stated "that the prior administration of EGT had badly mismanaged the roll-out of the Participation Business and, in particular, that the persons charged with the promotion of the business were unqualified and had little or no experience in, or familiarity with, the markets they were supposed to be penetrating and had done no due diligence with respect to particular venues or markets."  SAC ¶ 196.

[78]

> *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005) (corrective disclosure must "cause the decline in stock value that plaintiffs claim as their loss").

[79]

> *Id.* ¶ 177.

[80]

> *Id.* (emphasis added).

respect to the alleged disclosures regarding CasinoLink.  The SAC alleges that "the fact that EGT did not announce any adjusting of its average net win projections until February 19, 2008 – six months after the first EGMs had supposedly been 'Placed' in operation in August 2007 . . . caused concern among investors that CasinoLink . . . might, in fact, not be installed in all machines then in operation."[81]  Such a conclusory allegation, without more, fails to show that the alleged "truth" about the installation of CasinoLink in Asian venues had been revealed and caused a price decline.

### B. Many of the Alleged Misstatements Fell Within the PSLRA's Safe Harbor Provision

Many of the alleged misstatements cannot serve as the basis for plaintiffs' Section 10(b) claim by virtue of the PSLRA's safe harbor provision, which provides that forward-looking statements are deemed immaterial and non-actionable when they are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements."[82]  In other words, under the PSLRA, "a

---

[81]

SAC ¶ 165; *see also* SAC ¶ 180.

[82]

15 U.S.C. § 78u-5(c)(1)(A).

The PSLRA safe-harbor provision provides:

"[When a] private action . . . is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading," a defendant "shall not be liable with respect to any forward-looking statement . . . " if and to the extent that –

(A) the forward-looking statement is –

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to provide that it was made with actual knowledge that it was false or misleading."[83]

### 1.    $125 Net-Win Rate

The Court previously held that defendants' statements regarding the $125 net-win rate were forward-looking and fell within the protection of the PSLRA safe harbor.[84]  It noted also that plaintiffs had failed sufficiently to allege in the amended complaint that the defendants who made these statements actually knew that they were false when they made them.[85]  The SAC attempts to cure these deficiencies by adding allegations in an effort to demonstrate that at least some of the defendants knew that those statements were false when made.  This effort fails.

The SAC alleges that at least some defendants knew that the June 13, 2007 press release regarding the $125 net-win rate was false because defendant Pisano knew that EGL had been receiving net-win reports of less than $50 per day from one of the casinos, Premier VIP, which had

---

(B) the plaintiff fails to prove that the forward-looking statement – . . .

   (ii) if made by a business entity; was –

      (I) made by or with the approval of an executive officer of that entity; and

      (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading."  *Id.* § 78u-5(c).

[83]
   *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

[84]
   *Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d at 667-68.

[85]
   *Id.* at 668.

opened a few months before the SPPPA was announced.[86]

The fundamental problem with this assertion is that, the fact, if it be such, that two casinos reported lower than $125 net-win rates for some unspecified period around the time of the announcement of the SPPPA[87] says nothing about whether defendants knew that the net-win statement was inaccurate.  The statement complained of was that the EGMs across all venues – twelve venues existed as of September 10, 2007 – would achieve an "average" of $125 over the first year.[88]  Even if net-win reports from two venues showed that net-win averages for those casinos were below $125 for the first several weeks, it cannot reasonably be inferred that defendants knew that the daily net-win average over the first twelve-month period for all of the venues would be less than $125.

The foregoing is sufficient to dispose of plaintiffs' argument with respect to the net-win rate statement.  But it bears noting also that plaintiffs' premise that Pisano knew that EGL had been receiving weekly net-win reports from Premier VIP that showed much lower figures is not sufficiently supported by the SAC.  There is a footnote attached to the allegation about the reports that makes clear that plaintiffs rest the claims as to Pisano's receipt of such reports and, more importantly for presents purposes, as to what those reports said at the relevant point in time on (1) the allegation that Pisano at some unspecified time told someone at Strata that EGL regularly received weekly net-win reports from casinos, and (2) a calculation that plaintiffs made from data in EGT's 2008 10-K and its November 2007 10-K based on the unsubstantiated assumption that

---

[86]    SAC ¶ 62.

[87]    DI 80, at 9.

[88]    SAC ¶¶ 104, 164.

"there was no change in any operating conditions which would indicate a major drop in net win from Premier VIP since the opening in March 2007."[89]  The Court assumes the truth of the allegations that Pisano's alleged statements that EGL regularly received weekly net-win reports from the casinos. But it is quite a different matter to infer knowledge on the part of Pisano or anyone else that the net-win statement complained of was false simply because plaintiffs derived a lower figure from various SEC filings, especially where the SAC concedes that the computed figure rests on an assumption that is not supported by any well pleaded factual allegations in the pleading.  This all the more so where the reports, whatever they said or implied, were for a brief period, whereas the allegedly false statement was for a full year.

  The Court holds that the net-win statement is within the PSLRA safe harbor.

  2. *EBITDA Projections*

  The SAC alleges that a few statements regarding the EBITDA projections were false:

-  In the June 13, 2007 press release, defendants stated that "[b]ased upon current projections, the growth in both number of machines placed and EBITDA to [the Company] from this new revenue stream is expected to be 50% or greater in 2009.[90]

-  In a conference call the next day, when asked what he expected "EBITDA margins to be once things start get cooking, maybe a year out?," defendant Newburg stated that "I can give you the EBITDA margin . . . EBITDA margins will be something greater than 60% and the profit before tax margins will be something greater than 50%."[91]

---

[89]  SAC ¶ 62 & fn.1; *id.* App. 2.

[90]  SAC ¶ 61.

[91]  *Id.* ¶ 68(e); *see also* Bajwa Decl. [DI 84], Ex. 2, at 2.

- On a November 14, 2007 conference call, defendant Reberger stated in response to a question about "assumption[s]" in the Company's model, that "[t]he Company has given guidance as to future machine placements. Our EBITDA margins are over 90% and the share of revenue is 25%. So, I think people can work out what the earnings are to come out with their own earnings forecast."[92]

Defendants argue also that these were protected forward-looking statements.[93]  The projected EBITDA margins, like the $125 net-win figures they "were premised on,"[94] were indeed forward-looking statements within the meaning of the PSLRA.[95]  The SAC fails to allege facts that support a strong inference that any EGT officer knew that these projections were false or misleading when made.  As plaintiffs do not allege that any defendant who made these forward-looking statements about the EBITDA margin knew that they were false or misleading, those statements are protected by the PSLRA's safe harbor provision.

C.  *The Allegations of Misstatements Concerning EGM Placements Fail Adequately to Plead Falsity.*

Plaintiffs allege that defendants repeatedly misstated the number of EGMs that had been "placed" in various Asian venues.[96]  For example, in announcing that it had achieved the first

---

[92]  SAC ¶ 138(g); see Bajwa Decl. [DI 84], Ex. 7, at 5.

[93]  DI 80, at 11-12.

[94]  SAC ¶ 70.

[95]  *See* 15 U.S.C. § 78u-5(i)(1); *see also Slayton*, 604 F.3d at 766-67.

[96]  SAC ¶ 51.  The SPPPA defined a "placement" as:

"a Qualified Lessee's full-time operation of an EGM in its public gaming area pursuant to a Participation Agreement (subject to any temporary closure of such public gaming area for

25

milestone of the SPPPA on September 10, 2007, EGL stated that "at least 1,000 EGMs had been 'Placed' pursuant to the terms of the SPPPA, including 374 that were said to be 'producing revenue'."[97]  EGT revealed in its March 31, 2008 Form 10-K, however, that EGT had only 320 machines in operation as of December 31, 2007.  Plaintiffs claim that all 1,000 EGMs defendants claimed to have been placed by September 10, 2007 should have been in operation by December 10, even allowing for the three month delay provided for in the SPPPA.  The March 31 Form 10-K reveals that they were not.  This, plaintiffs claim, shows that the September 10 statement was false when made.

Such allegations of "fraud by hindsight" are insufficient to plead fraud.[98]  The fact that not all of the machines that EGT on September 10, 2007 claimed had been placed were in operation in December of that year does not show that EGT's statements in September were false when made.  Indeed, the SPPPA made clear that "placement" did not always require a machine to be in operation.  It instead stated that an EGM could be out of operation for up to three months and still be considered "placed," making it entirely plausible that the majority of the EGMs the company had placed in September were not in operation at quarter's end, even without considering the

---

[97]    a period of up to three months as may be required in order to comply with applicable Legal Requirements or due to any public safety reasons or other such causes which are beyond the reasonable control of the relevant Qualified Lessee."

SAC ¶ 108.

[98]    See Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978); San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs allege no circumstances to support their allegation that the allegedly false statements, made at least three weeks before the [sales] figure was announced, were false at the time made."); Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud.").

possibilities of breakdown or other failures that could have resulted in machines operable in September being out of service in December. Plaintiffs simply cannot rely on the figures announced for December to support their allegations that the statements made three months earlier were false.

Further, several of plaintiffs' allegations concerning the number of placed EGMs are based on a misconstruction of the documents on which the SAC relies. For example, plaintiffs claim that defendant Reberger's statements on a February 25, 2008 conference call were inconsistent with his October 31, 2007 letter to the SEC, in which he allegedly stated that "as of [October 31] EGT had 2,000 operating machines."[99] On the February 25 conference call, however, Reberger confirmed that only 1,107 EGMs were "open to the market and . . . earning revenue."[100] But Reberger's earlier letter to the SEC did not claim that 2,000 EGMs had been *placed*. Instead, he wrote that 1,000 machines had been placed, while another 1,000 machine lease agreements had been executed by EGL.[101] The fact that the machine lease agreements did not amount to 1,000 fully operating EGMs by the time of Reberger's February conference call is not sufficient to show that the statements he made four months earlier were false when he made them.

The SAC fails to state a claim under Section 10(b) of the Exchange Act. Count 1 is therefore dismissed.

### C.    *Control Person Liability*

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or

---

[99]    SAC ¶ 168.

[100]    *Id.*

[101]    *See* Bajwa Dec. [DI 84], Ex. 16.

indirectly, controls any person liable under any provision of this chapter . . . shall also be liable

jointly and severally with and to the same extent as such controlled person to any person to whom

such controlled person is liable, unless the controlling person acted in good faith and did not directly

or indirectly induce the act or acts constituting the violation or cause of action."[102]  As the SAC fails

to plead an underlying violation of the Exchange Act, its allegations of control person liability under

Section 20(a) fail also, Count 2 is dismissed[103]

III.    *Nevada Uniform Securities Act Claims (Counts 3 & 4)*

            The Court previously dismissed plaintiffs' claims under Section 90.580 of the Nevada

Revised Statutes because they had failed to allege that "defendants offered to sell, or that plaintiffs

received and accepted an offer to buy, EGT stock in Nevada" and because EGT's shares were traded

on a national stock exchange.[104]

            Plaintiffs now allege that defendants violated a different provision of the Nevada

Revised Statutes – Section 90.570 – which prohibits, *inter alia*, the use of a "deceptive or fraudulent

device, scheme or artifice to manipulate the market in a security."[105]  Claims under Section 90.570,

which "parallel Rule 10b-5" claims, must be pleaded with particularity.[106]

---

[102]

            15 U.S.C. § 78t(a).

[103]

            *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).

[104]

            *Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d 669.

[105]

            NEV. REV. STAT. § 90.580.

[106]

            *See Shivers v. Amerco*, 670 F.2d 826, 831 (9th Cir. 1982).

Plaintiffs' failure to adequately allege a Rule 10b-5 claim is dispositive of the claim under Section 90.570, and that claim is dismissed.  Plaintiffs' control person claims under Section 90.660(4) – which are predicated on an underlying violation of the Nevada securities laws – likewise are dismissed.

## IV.   *Breach of Fiduciary Duty Claim (Count 5)*

Like the amended complaint, the SAC alleges that the Individual Defendants breached their fiduciary duties by (1) making or approving the alleged false statements specified elsewhere in the SAC, and (2) "recommending to the minority shareholders, and by causing EGT to enter into, transactions that [the Individual Defendants] knew or should have known, by virtue of their status as directors or officers of EGT, Elixir or Melco, benefitted [EGL, Yuen] and others to the unfair detriment of the Plaintiffs and other minority shareholders of EGT."[107]

As the Court noted in its opinion on the motions to dismiss the amended complaint, the alleged breach of duty consisting of the "making or approving the materially false and misleading statements specified" in the SAC is a direct claim, as it alleges an individual harm, if it alleges any harm at all.[108]  Plaintiffs assert, however, that they are pursuing only a derivative claim in this count.[109]

The Individual Defendants argue that plaintiffs' derivative claim fails "due to an impermissible conflict of interest – they cannot bring direct and derivative claims in the same

---

[107]  SAC ¶ 260.

[108]  *Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d at 669.

[109]  DI 91, at 32.

action."[110]   Federal Rule of Civil Procedure 23.1 states:   "[a] derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association."[111]   Recovery in a derivative action inures to the corporation.   In a direct shareholder suit, however, recovery is made to the individual shareholder bringing suit.

In their direct claims against EGT, plaintiffs attempt to prove that the company committed securities fraud and that they, as shareholders, are entitled to damages.   At the same time, plaintiffs seek in their derivative claims to stand in the shoes of EGT and recover for its benefit against its officers and directors.[112]   This presents a conflict of interest impermissible under Rule 23.[113]

Plaintiffs apparently misunderstand this principle.   They argue that, "because they are no longer pursuing a direct claim for breach of fiduciary duty . . . the Individual Defendants'

---

110

DI 83, at 17.

111

FED. R. CIV. P. 23.1.

112

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 09 MD 2058 PKC, 2010 WL 5248815, at *2 (S.D.N.Y. Dec. 14, 2010) ("In bringing the '34 Act Complaint on his own behalf, the plaintiff seeks to prove unlawful conduct by Bank of America—the very entity in whose shoes he stands as a derivative plaintiff").

113

*Ryan v. Aetna Life Ins. Co.,* 765 F. Supp. 133, 136-137 (S.D.N.Y. 1991) (finding plaintiff "subject to a conflict of interest in pursuing both direct and derivative claims in this action, which renders him unable 'fairly and adequately [to] represent the interests of the shareholders'") (quoting FED. R. CIV. P. 23.1); *St. Clair Shores Gen. Empls. Ret. Sys. v. Eibeler,* 2006 U.S. Dist. Lexis 72316, at*23 (S.D.N.Y. Oct. 4, 2006) ("[c]ourts in this Circuit have long found that plaintiffs attempting to advance derivative and direct claims in the same action face an impermissible conflict of interest").

motion to dismiss must be denied."[114]  But plaintiffs' attempt to restyle the direct breach of fiduciary

duty claim that was in the amended complaint  into a derivative one in the SAC does not help their

cause.   The SAC asserts a plethora of direct claims against EGT, EGL, and the Individual

Defendants.   Accordingly, plaintiffs cannot "adequately represent the interests of shareholders . .

. who are similarly situated in enforcing the right of the corporation."   The derivative claim for

breach of fiduciary duty – Count 5 – is thus dismissed.[115]

## V.     Breach of the Warrant Purchase Agreement Claim (Count 9)

Like the amended complaint, the SAC, which is far from a model of clarity on this

point, appears to allege that EGL breached one of the warranties in the WPA:[116] that EGL "has not,

and to its knowledge no one acting on its behalf has taken, directly or indirectly, any action designed

to cause or to result in the stabilization or manipulation of the price of any security of EGT to

facilitate the sale of the Warrants."[117]  This is essentially informed by plaintiffs' memorandum.[118]

As the Court noted previously,"Strata's claim [with respect to the former warranty]

---

[114]

DI 92, at 31.

[115]

Indeed, at least one court in this district has held that a shareholder who attempts to bring
direct claims against a corporation as well as derivative claims on behalf of that corporation
in *separate actions* is barred from doing so under Rule 23.1.  *See In re Bank of Am.*, 2010
WL 5248815, at *3 ("The plaintiff has engaged in the litigation equivalent of riding two
horses until the rider determines which is stronger and faster. . . [and] a willingness to cast
aside a derivative claim, if it is the slower and weaker horse, does not speak well of a
person's adequacy as a representative of others.").

[116]

The WPA specifies that New York law governs all claims brought pursuant to it.

[117]

*Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d at 677; SAC ¶ 149(a)-(b).

[118]

DI 93, at 21-22; ¶¶ 286-92.

essentially restates its securities fraud claims against EGL, except that . . . the warranty speaks only to specific intent or 'design' – not recklessness – in manipulating EGT's stock and warrant prices."[119]  The Court dismissed that claim, explaining that the alleged breach of warranty by stock manipulation was insufficient because the amended complaint failed to plead facts giving rise to "a strong inference that someone whose intent could be imputed to the corporation [– the warrantor –] acted with the requisite *scienter.*"[120]

   The SAC has somewhat repackaged the product that rests on the first of the alleged warranties, but the repackaging has not improved the product.  Now the pleading alleges that the warranty was breached "when the representations and warranties made by EGT and Elixir were untrue and inaccurate in numerous material respects."[121]  But the warranty relied upon warranted only that EGL and, to its knowledge, those acting on its behalf had not taken "any action designed to cause or to result in the stabilization or manipulation of the price of any security of EGT to facilitate the sale of the Warrants."  Stabilization and manipulation of security prices are terms of art.  They require pleading and proof of *scienter* as does, for that matter, the use of the word "designed" in the warranty.  As the SAC does not allege with particularity that anyone designedly or deliberately manipulated or stabilized the price of EGT securities, let alone that they did so to induce the sale of the Warrants, this claim fails.

   Plaintiffs' memorandum of law for the first time seeks to introduce a new breach of warranty claim – namely, that EGT breached its warranty that the "transfer and sale of the Warrants

---

[119] *Id.* at 677.

[120] *Prime Mover Capital Partners, L.P.,* 793 F. Supp.2d at 678.

[121] SAC ¶ 289.

32

. . . do not and will not . . . conflict with or result in a violation of any law . . . to which [EGL] is subject" on the theory that the sale of the warrants violated Section 16(b) of the Exchange Act.[122]

As an initial matter, plaintiffs may not amend the pleadings yet again by articulating in their papers in opposition to a motion to dismiss their third complaint in this action a brand-new theory.  They have had adequate opportunities to plead this claim and will not be heard to raise it now.  In any case, an amendment to assert this new claim would be futile, as the claim is insufficient as a matter of law.

Section 16 provides, in relevant part:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer."[123]

It "requires that any profits derived from short-swing trading be disgorged to the issuer of stock."[124] The statute defines short-swing trading as "the purchase and sale (or vice versa) of a company's stock within a six-month period by persons deemed to be 'insiders,'" and "insiders" as "beneficial owner[s] of more than ten percent of any class of the company's non-exempt registered equity securities, or a director or officer of the company issuing the stock."[125]

Strata claims "EGL breached its representations and warranties in the WPA when

---

[122]   DI 93, at 23.

[123]   15 U.S.C. § 78.

[124]   *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001).

[125]   *Id.*

it sold warrants . . .  within 6 months of the September 10, 2007 closing of the SPPPA, putting its ownership of EGT over 10% and subjecting it to Section 16(b)."[126]  EGL argues that the Section 16(b) allegation fails because (1) such claim "would belong to the issuer," and (2) "EGL did not become a 10% shareholder until the close of the SPPPA, thus putting their stock sales outside the purview of the statute."[127]  EGL is correct on at least the second of these points.

Section 16(b) makes clear that it "shall not be construed to cover any transaction where such beneficial owner was not such *both* at the time of the purchase *and* [the] sale, or the sale and purchase."[128]  To be considered a beneficial owner "at the time of the purchase," an insider must have been "a beneficial owner '*before* the purchase'."[129]  EGL did not become a 10 percent shareholder until after the closing of the SPPPA.  Plaintiffs allege EGL sold warrants within six months after the SPPPA closed.[130]  "Although [EGL] became a beneficial owner of [EGT] by acquiring [shares through the SPPPA], it was not a beneficial owner 'at the time'" the SPPPA closed.[131]  Its sale of the warrants therefore is not covered by Section 16(b).

Strata has thus failed to allege EGL violated any warranty in the WPA, and Count

---

[126]     DI 93, at 24.

[127]     DI 97, at 10.

[128]     15 U.S.C. § 78p (emphasis added).

[129]     *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 250 (1976) (emphasis added).

[130]     DI 93, at 24.

[131]     *Id.* at 239.

9 is dismissed.

VI.     *Other Common Law Claims*

    A.     *Choice of Law*

        Plaintiffs assert that Nevada law applies to plaintiffs' common law tort claims while defendants argue that New York law controls.  This is resolved by the choice of law rules of their New York forum.

        Under New York choice of law rules, when substantive differences exist between the law of two relevant jurisdictions, courts look to which jurisdiction has the greatest interest in regulating the tortious conduct at issue.[132]  The "law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."[133]  When the substantive law of the relevant jurisdictions does not differ, "a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."[134]

        In the Court's decision on the previous motions to dismiss, it held that plaintiffs had not alleged sufficient facts for the Court to determine which jurisdiction had the most significant

---

[132]    *E.g.*, *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006) ("The New York Court of Appeals has defined "interest analysis" as requiring that '[t]he law of the jurisdiction having the greatest interest in the litigation will be applied and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.'").

[133]    *Id.* at 384-85.

[134]    *Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F. 3d 137, 143 (2d Cir. 2004).

contacts with plaintiffs' tort claims."[135]  Plaintiffs claim to have alleged additional facts showing that Nevada law should apply, but their arguments are not persuasive.

As they did in opposition to the motions to dismiss the AC, plaintiffs argue that Nevada law should apply because: (1) EGT is incorporated and headquartered in Nevada, (2) EGT issued at least some allegedly fraudulent press releases in Nevada,[136] (3) at least five of the Individual Defendants resided and worked in Nevada, and (4) the SPPPA closed in Nevada.[137]  The SAC adds the conclusory allegation that "given these facts, Nevada has the greatest interest in regulating the conduct at issue here, i.e., the improper marketing and selling of shares of its domestic companies."[138]

The SAC, contrary to this conclusory statement, alleges that "many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in [New York] and that "a substantial part of the events or omissions giving rise to the claims . . . occurred in [New York].[139]  Moreover, Prime Mover's and

---

[135]

*Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d 673.

[136]

While EGT is incorporated and located in Nevada, EGL is incorporated and located in Hong Kong, and the SAC alleges that its allegedly false statements were made in New York, the Philippines, and California.  SAC ¶¶ 75, 99, 102.

[137]

DI 90, at 26; *see Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d 673 n.114.

[138]

SAC ¶ 278.  In its memoranda in opposition to the motions to dismiss, plaintiffs assert also that (1) the EGT Directors' Option Plan was established and run by EGT's board in Nevada, (2) that certain options received under this plan were contingent upon the closing of the SPPPA, and (3) that at least two EGT officers and directors allegedly backdated some of the options they received in Nevada.  DI 90, at 26; DI 93, at 25.  These additional allegations do little, if anything, to aid plaintiffs' arguments.

[139]

SAC ¶¶ 31, 32.

Strata's principal places of business are in New York and California, respectively, so the injuries stemming from any fraudulent conduct would have been felt in those states – not Nevada.[140]  In consequence, there is no reason to conclude that Nevada has the greatest interest in regulating the tortious conduct alleged in this action.  The Court therefore applies the law of the forum chosen by plaintiffs – New York – to the common law fraud, negligent misrepresentation, and unjust enrichment claims.[141]

### B.   Common Law Fraud (Count 6)

"A New York common law fraud claim is defined as a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury."[142]  The elements of common law fraud are substantially identical to the elements of a Section 10(b) claim.[143]  Plaintiffs' common

---

[140]

       *Id.* ¶¶ 5-8.

[141]

       *See Prime Mover Capital Partners, L.P.*, 793 F. Supp. 2d 673 (citing *Conceria Vignola SRL v. AXA Holdings, LLC*, 2010 WL 3377476, *3 (S.D.N.Y. Aug. 3, 2010) (applying forum law where "[p]laintiff's allegations . . . do not clearly establish the "center of gravity" of the parties' contract"), and *Bravado Intern. Grp. Merchandising Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 193 n.14 (E.D.N.Y. 2009) ("Since the Complaint does not specify the location of the assets alleged to have been fraudulently conveyed by Schwartz, there is no way for the Court to make a choice of law determination with any certainty. Because plaintiffs have chosen to bring their action in New York, the Court has assumed that the law of New York applies.")).

[142]

       *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104-05 (2d Cir. 2001) (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 250 N.E.2d 214, 25 N.Y.2d 112, 119 (1969)).

[143]

       *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 195 (S.D.N.Y. 2006).

law fraud claim thus fails for the same reasons as the Section 10(b) claim.[144]  Count 6 is dismissed.


> C.       *Negligent Misrepresentation Claim (Count 7)*

A negligent misrepresentation claim is sufficient only when the negligent statement

is "expressed directly, with knowledge or notice that it will be acted upon, to one to whom the

author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he

acts at all."[145]  In other words, New York law requires a "fiduciary duty"[146] or "special relationship"

that involves "a closer degree of trust between the parties than that of the ordinary buyer and seller

in order to find reliance on such statements justified."[147]

Defendants argue that plaintiffs continue to fail to allege the existence of such a

special relationship.[148]  Plaintiffs do not respond to this argument, except to assert that Nevada law

---

[144]

Unlike Section 10(b), common law fraud reaches also alleged injuries based on plaintiffs' decisions to hold their investments in reliance upon the alleged fraud.  *See Weinberger v. Kendrick*, 698 F. 2d 61, 78 (2d Cir. 1982).  The SAC adds allegations, that in addition to purchasing or selling shares of EGT's common stock on specific dates, they "continued to hold the remainder of [their] position in reasonable reliance on the truth of the foregoing false and misleading statements and omissions by defendants."  ¶ 80; *see also* ¶¶ 120, 160, 161.  The dismissal of the Section 10(b) claims is based on plaintiffs' failure to allege loss causation, falsity, and knowledge on behalf of defendants' who made forward-looking statements.  It has nothing to do with plaintiffs' purchases or sales of EGT stock.  Plaintiffs' common law holder claims are dismissed for the same reasons as the Section 10(b) claims.

[145]

*White v. Guarente*, 372 N.E.2d 315, 43 N.Y.2d 356, 363-64 (1977) (citation omitted); *see also Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 539 (S.D.N.Y. 2007).

[146]

*Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992) (citation omitted).

[147]

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003).

[148]

*E.g.*, DI 80, at 23-24; DI 85, at 30.

– which requires no special relationship – applies.[149]   Indeed, the SAC alleges only that "[d]efendants had a duty to use ordinary care with respect to statements made to Plaintiffs in connection with their dealings."[150]  Plaintiffs therefore again fail to allege the relationship necessary to make out a negligent misrepresentation claim under New York law.  Count 7 is dismissed.

### D.   Unjust Enrichment Claim (Count 10)

A plaintiff seeking damages on an unjust enrichment claim must allege that "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution."[151]

Defendants make two arguments in favor of dismissing the unjust enrichment claims: that (1) insofar as Strata alleges claims based on the stock purchased pursuant to the SPA and WPA, the claims are precluded by the existence of valid and enforceable contracts, and (2) plaintiffs allege no direct benefit to defendants, which is an essential element of such a claim.[152]

In response to the first argument, plaintiffs argue that Prime Mover "never entered into any agreements with EGT," and that "although plaintiff Strata did purchase warrants and stock pursuant to the SPA and the WPA, they also invested in EGT separately (via the open market),

---

[149]

DI 90, at 28-29; DI 93, at 27-28.

[150]

SAC ¶ 273.

[151]

*CBS Broadcasting Inc. v. Jones*, 460 F. Supp. 2d 500, 506 (S.D.N.Y. 2006) (quoting *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004)).

[152]

DI 81, at 25; DI 83, at 17; DI 85, at 34.

without any contract governing those purchases."[153]  In response to defendants' second argument, plaintiffs do not dispute that they have not alleged a direct benefit; they argue only that Nevada law should apply.[154]

Defendants are correct that Strata's unjust enrichment claims fail to the extent they are based on purchases of stock pursuant to the SPA and WPA.  "It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement."[155]

Moreover, plaintiffs' unjust enrichment claims fail as a whole because plaintiffs have alleged no direct benefit to defendants.  As in the amended complaint, the SAC alleges only that plaintiffs "conferred a benefit upon the . . . Defendants by purchasing [EGT's] securities at artificially inflated prices."[156]  Plaintiffs admit that they allege that defendants "received an indirect benefit from [their] stock purchases."[157]  Under New York law, however, this type of indirect benefit is insufficient to sustain an unjust enrichment claim.[158]  The unjust enrichment claim therefore is

---

[153]

DI 90, at 29.

[154]

DI 90, at 29; DI 92, at 31; DI 93, at 28-29.

[155]

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190 (1987).

[156]

SAC ¶ 294.

[157]

DI 90, at 29.

[158]

*See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (unjust enrichment claim requires an allegation of a "specific and direct benefit" received by the defendant); *Simon v. Keyspan Corp.*, 2011 WL 1046119, at *12 n.143 (S.D.N.Y. Mar. 22, 2011) ("Plaintiff's unjust enrichment claim . . . must be dismissed on the ground that plaintiff has failed to allege that defendants received a 'specific and direct benefit' from plaintiff.").

dismissed.

*Conclusion*

For the foregoing reasons, defendants' motions to dismiss [DI 80, DI 82, DI 85] the SAC are granted.

SO ORDERED.

Dated:          September 27, 2012

_____

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)